## The Commonwealth of Pennsylvania *v.* Edward Cressinger, Appellant.

*Criminal law—Murder—Pleading—Jury.*

The plea of not guilty is within the Act of March 31, 1860, section 53, P. L. 439, which makes pleading the general issue " a waiver of all errors and defects in or relevant or appertaining to the precept, venire, drawing, summoning and returning of jurors."

Where the identity of jurors whose names were put in the wheel with those who were drawn and summoned is not disputed, mere mistakes in the initials, the Christian names and the spellings of the surnames of the jurors do not furnish grounds for quashing the venire after a plea of not guilty has been entered.

After the regular panel has been exhausted without obtaining a jury in a murder trial, a special venire may issue to summon jurors either from the bystanders or from the body of the county or from both.

*Criminal law—Murder—Confession.*

The fact that a confession of murder was obtained by a trick is no objection to its competency unless the circumstances are such as to suggest an inference that through fear or hope a false confession has been made.

*Criminal law—Murder—Evidence—Insanity—Competency of witness—Physician.*

On the trial of an indictment for murder, the testimony of a physician who is called, not as an expert but as a neighbor of the prisoner, to testify as to the prisoner's sanity, is entitled to weight because of his education and practice as a physician.

Where two physicians testify that the prisoner is mentally dull and morally weak, but refuse to say affirmatively that he is insane or irresponsible, the trial judge is justified in omitting to instruct the jury as to the value of the expert testimony as to the insanity of the prisoner.

*Criminal law—Murder—Separation of jury.*

The fact that a jury in a murder trial in leaving the court room in charge of the tipstaves are, for a minute or so, intermingled with other persons is no ground for setting aside a verdict of guilty of murder, where it appears that nothing was said to or by any of the jurors during the occurrence.

Argued Oct. 16, 1899. Appeal, No. 231, Jan. T., 1899, by plaintiff, from judgment of O. & T. Northumberland Co., Dec. T., 1898, No. 3, on verdict of guilty of murder. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Indictment for murder.    Before SAVIDGE, P. J.

At the trial it appeared that on October 10, 1898, Daisy Smith, a girl about sixteen years of age, residing in Lower Augusta township, was shot and killed on her father's farm.    Suspicion was directed toward the prisoner, the son of a neighboring farmer.    Two of the neighbors went to defendant's home where they found him washing a shirt bespattered with blood.

Counsel for the commonwealth offered to prove by J. L. Grimm that he, in company with Miles Dougherty, called at the county jail; that the prisoner was brought into the jail office and that they there had a conversation with him and that he confessed to the commission of the crime.

Counsel for the prisoner objected, because when the prisoner was interrogated he had been but recently placed under duress without process of law; that he was under illegal restraint, and had not been informed what his rights were under the circumstances; that he had no opportunity of procuring counsel or advice; that while he was yet subjected to the fear and terror incident upon his arrest and incarceration in the middle of the night, and before he had time to acquire even proper composure, in ignorance of his rights, he was, with undue haste, visited by the officers of the law, who immediately informed him who they were, thus being placed in a situation which must necessarily have terrorized him, which circumstances were followed by an artifice and trick by which he was induced to make a statement which they allege to be a confession, and by reason of the artifice and trick might have been induced with the hope of some benefit, or at least while he was under the influence of fear, to make statements which it is proposed to use to his injury; and because the evidence offered is incompetent and illegal.

The Court: Whether the trick in this case was such as to excite hope or fear cannot be known until we hear what it was.    We must know that before we can rule on this proposition.

Exception for prisoner and bill sealed.

The Court: I suppose it is of very little consequence which side finds out what the trick was.

Mr. Mahon, of counsel for commonwealth: Go on and state what you said to the prisoner on the evening of October 11,

without giving what he said to you.  What did you first say to him when he was brought into the office ?

The Court: That he has explained to us already, and after he had explained what he had said, leading up to the confession, Mr. Oram asked whether he had resorted to any trick, and he said he had.

" Q. Go on and state what you characterized as a trick on your part on that occasion.  A. Why we discovered that the knife was bought down at Mrs. Bohner's, but we could not get any trace of who bought on the Monday previous, being the last knife of the kind that she had, but we also found that she got her knives from Mr. Hackett in town. . . . I went into Hackett's store and asked him for a pocket knife of the kind that Mrs. Bohner got; and he said she bought three or four different kinds, and he asked what kind I had reference to and I said I would like to get a two-bladed barlow, both at one end, and he said, 'I have some of that kind,' and he got one; and I says, 'I would like to borrow this for a few days and if I don't bring it back I will pay for it,' and I put it in my pocket and went to the jail; and after talking a while I reached down in my pocket and pulled this out and I said, ' Ed. I found your knife.' "

The other material facts appear in the opinion of the Supreme Court.

Mr. Oram : " Q. Then the statement he made was induced by that?  A. Yes, sir ; in that way."

The Court: Is that all, by way of trick ?

"A. I gave it to the prisoner and he examined it.  He asked, ' Where did you get it ? '  I said, ' Just where you put it,' and he asked me the second time and I gave him the same answer, and he asked the third time, 'I would like to know where you got it ; ' and I says, ' Nobody knows better than you ; I got it just where you put it,' and then he began and told me where I got it."

Counsel for the prisoner renews objections previously made.

The Court: We are of the opinion that we cannot say, as a matter of law, that the trick spoken of by the witness was calculated to produce such a state of hope or fear on the mind of the prisoner as would lead to an untrue confession.  We therefore overrule the objection and admit the testimony.

Exception for prisoner and bill sealed.

"Q. State whether or not what he said to you was reduced to writing. A. Yes, sir. Q. Was it read over to him after it was reduced to writing? A. Yes, sir. Q. Was it signed? A. Yes, sir. Q. By whom? A. Edward Cressinger. [Exhibit No. 2, February 9, J. F. G., shown witness.] Q. What is that? A. It is the confession of Edward Cressinger as to his connection with the murder of Daisy Smith."

Counsel for the commonwealth offer the confession in evidence.

Counsel for the prisoner object, for the reason that the commonwealth has not shown the entire conversation that took place which led up to the production of this writing. We are entitled to all that occurred.

The Court: They are entitled to everything. If there was anything preceding that, which I presume they are able to tell from the preliminary examination already, please bring it all out.

Mr. Oram: "Q. Go on and state all that occurred, which led up to this confession that you have in this writing? A. When I told him, 'Nobody knows better than you;' he says, 'You must have found it at the apple tree where the wash bench stands;' I said, 'Certainly, you knew where you put it.' I looked at him straight and says, 'Ed., why did you do it?' And just at that time Dougherty says, 'Did you have a quarrel?' And Ed. says, 'Yes, she slapped me,' and Dougherty kind of raised himself up, and said, 'I don't want you to say another word, unless it is voluntarily, because anything you say we will use against you.' Q. Is this confession in your handwriting? A. Yes, sir, it don't show it very plainly because I was kind of nervous when I wrote it."

Counsel for the commonwealth renewed offer to read the confession.

Counsel for the prisoner objected, (1) because it appears from the testimony of the witness on the stand that he obtained this written statement by the perpetration of a double fraud. First, by showing a knife which he represented as belonging to the prisoner, and second, by claiming to have found it at the precise place where the prisoner left it, both of which assertions were untrue and false and calculated to induce the fear of the prisoner, he being then not under legal arrest by

virtue of any legal warrant, but in the duress of another county official; (2) because the writing was not taken down by a competent party in a competent hearing, but was taken down by the party who perpetrated the fraud upon the prisoner, and needs his evidence, that it is a continuation of the fraud; (3) because written statements so procured and written down as this was done, without opportunity to the prisoner to be advised as to his legal rights by competent counsel, keeping him in duress without a proper commitment, was such a violation of the prisoner's rights as to render the prisoner's confession inferentially void.

The Court: Objection overruled and bill sealed for the prisoner. [5]

Dr. G. H. Gerringer recalled for further examination.

Mr. Mahon: "Q. You know Edward Cressinger? A. Yes, sir. Q. How long have you known him? A. I suppose eight or ten years, anyhow. Q. How often have you seen him yearly during the last five years? A. I have seen him quite frequently; I couldn't say how often. Q. State whether or not he was in your employment. A. He worked on my premises, but I did not employ him. Q. Did you see him work on your premises? A. Yes, sir. Q. What did he work at? A. He was cleaning up the garden. Q. Your garden? A. Yes, sir. Q. How did he perform that labor? A. Satisfactorily. Q. What other labor did he perform for you, if any? A. He helped my wife wash still, worked the wash machine. Q. You saw him do that? A. Yes, sir. Q. How did he perform that labor? A. All right. Q. Do you recall any other labor that he did for you? A. He cleaned out my stables several times. Q. How did he do that? A. All right. Q. State whether or not he lived at your house when he worked for you. A. Yes, sir. Q. Did he take his meals there? A. Some of them at least. Q. Sleep there? A. No, sir. Q. Did you observe, during this time, his speech and conduct? A. Yes, sir? Q. General deportment? A. Yes, sir. Q. You may now state, Doctor, whether you observed anything in his speech, conduct, labor and the manner in which he performed it, during all the time you have known him, which led you to believe that he was of unsound mind."

Counsel for the prisoner objected, because the question is

put to the witness in his capacity as a physician, and because the circumstances narrated are not sufficient to qualify him as a witness.

The Court: The witness is asked, not as a physician or expert, but as a layman or nonexpert, what his observation of the conduct of the defendant has been during the period of time he has been acquainted with him. We think it is admissible and will allow the question to be asked. The fact of his being a physician does not change the legal situation. Objection overruled and evidence admitted, to which the prisoner excepts and bill sealed.

"A. I did not." [7]

The prisoner moved to quash the venire because: (1) the venire and the array attached contains the names of jurors who are in attendance and who were not drawn from the wheel; (2) jurors were summoned who are not named in the venire; (3) names of jurors were drawn from the wheel who are not named in the venire; (4) names of jurors were drawn from the wheel who are not summoned or in attendance; (5) jurors were summoned and are in attendance who were neither drawn from the wheel nor named in the venire; (6) the panel was not drawn, nor the jurymen named, summoned as required by law; (7) the venire is incomplete, imperfect, irregular and illegal.

The Court: From the knowledge I have from the sheriff there is nothing here that would warrant the court in quashing the venire, or the array. The venire was properly issued, the precept was in form. There are some mistakes in both surname and Christian name, but we would have to have more than this before us before quashing the venire. We will therefore overrule the motion to quash and seal a bill for the prisoner. [1]

The prisoner renewed his motion to quash the venire as follows: and now, February 7, 1899, it appearing from the examination of jurors on their voir dires that Martin K. Bachman was summoned and attended instead of W. K. Bachman, the juror drawn; that John Gribbons was summoned and attended instead of John Gibbons, the juror drawn; that Anthony Marchetty was summoned and attended instead of Tony Maretity, the juror drawn; and that George Mutchler was returned by the sheriff as drawn, and was summoned and attended, and

it appears that John L. Mutchler was the name put in the wheel.

The Court: There was a time and place for making this objection, at which time and place the proof of the alleged facts in the motion should have been furnished. The court is satisfied from the evidence, from what has transpired in the selection of a jury, and from the answers of the jurors who have answered the questions asked them, that there is no such person in the district from which W. K. Bachman was selected as W. K. Bachman and that M. K. Bachman was intended. Moreover, the challenge for cause was sustained and the prisoner cannot be prejudiced. It also further appears that there was no such person as Tony Maretity in the district in which that person is drawn and that Anthony Marchetty was the person named, and the challenge for cause was sustained in that case. The same is true in all other instances where mistakes have been made in the placing of the names of jurors in the jury wheel by the jury commissioners. Moreover, the prisoner is not deprived of any constitutional right, because there is in attendance enough jurors to constitute a legal oyer and terminer jury, the number ordered to be elected having been made exceptionally large to meet the contingencies such as have arisen in the selection of this jury. Motion overruled and bill sealed for the prisoner. [2]

The panel having been exhausted, and the jury not completed, the court ordered a special venire to issue, directing the sheriff to summon from the body of the county ten persons qualified to act as jurors in our several courts.

In accordance with the order of the court ten persons were summoned and came forward and were sworn on their voir dire.

The prisoner objected to the issuance of a special venire, because, by reason of the illegalities, imperfections in the regular panel and array in the summoning of jurors not drawn, he had been deprived of his legal right of a full panel, duly drawn, summoned and in attendance, and cannot now have a constitutional trial, and the court is without authority under the circumstances to award such venire.

The Court: Objections overruled and bill sealed for the prisoner. [3]

The prisoner moved to quash the panel and array of the special venire returned by the sheriff, for the reason that the same

was not summoned and returned in accordance with the command of his writ from the body of the county.

The Court: Motion overruled and bill sealed for the prisoner. [4]

The court charged in part as follows:

It has not been contended, as you have heard by counsel for the defense, that the killing of this girl was not done by Edward Cressinger, nevertheless it will be for you to find from all the evidence in the case whether Daisy Smith met her death at the hands of this defendant. That will be the first question for your determination, naturally, and as to that you have the confessions of the defendant supported by other facts and circumstances which you will remember and consider in determining the question. What those facts and circumstances were and what those confessions were, and when and how they were made, you will remember. That is, it is wholly unnecessary that I should refer to them further. [6] . . . .

You will remember what the experts say as to the condition of this young man. It is admitted that physically, and if I remember correctly, the physicians so testify, he is rather a robust and well built lad. They have told what condition they found him in when they visited the jail a week or two ago. It is not my purpose to go into it in detail, although I have it right before me, because I am satisfied that you will remember what that testimony was. You will remember the testimony as to his sexual habits. It is contended that he was addicted to the practice of masturbation, and also that he was a sexual pervert, and what those terms mean was explained to you from the witness stand. It is contended that the unsound condition of his mind is due, at least partially, to hereditary causes; that his grandfather died of softening of the brain; that he has a second or third cousin, third cousin I believe the evidence shows, at the asylum in Danville. That is on the one side. And on the other side his mother died of tuberculosis, or consumption, and that both parents of the mother died of the same disease. It is contended that this fact accounts to some extent, at least, for the unsound condition of his mind. On the other hand, it is contended that the boy did not differ from the ordinary run of boys, that his mind is not affected and was not affected at the time

of the commission of this crime ; that during a long course of years, in the association with his neighbors, nothing had ever been noticed by any of those who testify on the part of the commonwealth that was extraordinary or out of the way, or that would indicate unsoundness of mind, or mental deficiency. [17]

Verdict of guilty of murder in the first degree, and sentence passed upon the verdict.

*Errors assigned* among others were (1, 2) refusal to quash the venire; (3, 4) refusal to quash special venire ; (5, 7) rulings on evidence as above, quoting the bill of exceptions ; (6) failure to call the jury's attention, in connection with the above instructions, to the inducement which led to the confession, and its effect; (17) failure of the court, in connection with the above instructions, to charge fully on the value of the expert testimony as to the insanity of the prisoner ; (19) refusal to arrest judgment because of separation of jury.

*Charles M. Clement* and *William H. M. Oram*, for appellant.—The venire should have been quashed : Com. v. Spring, 5 Clark, 240 ; Com. v. Freeman, 166 Pa. 334 ; Clark v. Com., 29 Pa. 135.

The confession was inadmissible : Com. v. Johnson, 162 Pa. 71 ; Brown v. Com., 76 Pa. 338; Com. v. Cutaiar, 5 Pa. Dist. Rep. 403 ; Com. v. Wilson, 186 Pa. 22.

The jury was not bound to adopt the conclusions of the experts, yet they should have been instructed to give a careful consideration to the testimony of those who had made the diseases of the human mind a special study : Wells v. Leek, 151 Pa. 438 ; First Nat. Bank v. Wireback, 106 Pa. 47 ; Meyers v. Com., 83 Pa. 143 ; Com. v. Bezek, 168 Pa. 616 ; Tietz v. Philadelphia Traction Co., 169 Pa. 525.

The prisoner's constitutional right to have a trial by an impartial jury without separation or communication with outsiders does not rest in the discretion of the court below : Goersen v. Com., 106 Pa. 478; Kramer v. Kister, 187 Pa. 227 ; Com. v. Moss, 107 Pa. 267 ; Com. v. Eisenhower, 181 Pa. 470; Alexander v. Com., 105 Pa. 11 ; Com. v. Peiffer, 15 Pa. 468; Com. v. Hilands, 111 Pa. 1.

*P. A. Mahon*, with him *D. W. Shipman*, district attorney, for appellee.—A party who neglects before plea to challenge the array cannot take advantage of the alleged defect afterwards: Wharton on Crim. Pleading & Practice (8th ed.), sec. 610; Foust v. Com., 33 Pa. 338.

It is apparent that one of the clauses of section 53 of the Act of March 31, 1860, P. L. 443, is pleading the general issue; and the defendant in the language of the act waived every error and defect in all that related to the jury by pleading, before he made his motion to quash: Com. v. Freeman, 166 Pa. 332; Lynch v. Com., 77 Pa. 205; Com. v. Smith, 2 S. & R. 300; Com. v. Sallager, 3 Clark, 127; Burton v. Ehrlich, 15 Pa. 236; Jewell v. Com., 22 Pa. 94; Donaldson v. Com., 9 W. N. C. 393; Rolland v. Com., 82 Pa. 306; Com. v. Haggerty, 3 Brewster, 285; Com. v. Chauncey, 2 Ash. 90.

It is generally agreed that deliberate confessions of guilt are among the most effectual proofs in the law.   Such confessions made by a prisoner at any moment of time, and at any place, subsequent to the perpetration of the crime, and previous to his examination before a magistrate, are at common law received in evidence as among proofs of guilt: 1 Greenleaf on Evidence, sec. 215; McClain v. Com., 110 Pa. 263; Com. v. Mosler, 4 Pa. 264; People v. Murphy, 63 N. Y. 590; Balbo v. People, 80 N. Y. 484; Rizzolo v. Com., 126 Pa. 72; Brown v. Com., 76 Pa. 319; Com. v. McGowen, 4 Clark, 274; Com. v. Hanlon, 8 Phila. 423.

When insanity of the defendant is set up as a defense, it is incumbent on him to rebut the ordinary presumption of sanity, and show, not beyond a reasonable doubt, nor either clearly or conclusively, but by fairly preponderating evidence, such as is ordinarily required to prove a fact in civil issues, that he was insane at the time of committing the alleged crime: Com. v. Gerade, 145 Pa. 289; Lynch v. Com., 77 Pa. 205; Ortwein v. Com., 76 Pa. 421; Coyle v. Com., 100 Pa. 573; Com. v. Werling, 164 Pa. 560; Com. v. Woodley, 166 Pa. 469; Brown v. Com., 78 Pa. 128; Com. v. Hollinger, 190 Pa. 155.

OPINION BY MR. JUSTICE MITCHELL, October 30, 1899:

The assignments of error to the refusal of the court to quash the venire and the array of jurors are without substantial bear-

ing on the only issue in the case, the guilt or innocence of the prisoner. They are purely technical, and technically the motions were too late. The irregularities on which the motions were based consisted in mistakes in the initials, the Christian names and the spelling of the surnames of five jurors in the panel of sixty. The identity of the persons whose names were put in the wheel with those who were drawn and summoned was not disputed. Even under these circumstances, however, the court guarded the prisoner from any possible disadvantage by sustaining his challenges for cause based on the misnomers, in every instance but one. In that one the juror was summoned and returned as Voris Metzgar, but testified on his voir dire that his right name was Verius, but that he was called Voris "by some people, not all of them." This comes so clearly under the rule of idem sonans that it does not admit of discussion. These matters are referred to only to show that the court was more than careful to see that the prisoner should not suffer any practical disadvantage from the application of technical rules as to the time of the motions. As already said they were too late. The plea of not guilty is within the Act of March 31, 1860, P. L. 439, section 53, which makes pleading the general issue " a waiver of all errors and defects in or relative or appertaining to the said precept, venire, drawing, summoning and returning of jurors," as well as within the Act of February 21, 1814, 6 Smith's Laws, 111, of which this section of the act of 1860 is a substantial re-enactment: Com. v. Freeman, 166 Pa. 332.

The objections to the special venire are equally untenable. The regular panel having been exhausted without obtaining a jury, a special venire was ordered, and drawn in accordance with law. " There is no ground therefore to support a distinction . . . . that, under an order of talesmen, the venire must issue generally and not specially to summon the bystanders only, or specially for persons from the body of the county only. Under the Criminal Procedure Act the sheriff may summon the talesman from either or both. The expression tales de circumstantibus was evidently intended to include both : " Brown v. Com., 76 Pa. 319, 337.

The evidence of the confession made to Grimm was properly admitted. The fact that it was obtained by a trick is no ob-

jection to its competency unless the circumstances are such as to suggest an inference that through fear or hope a false confession may be made.   There were no such circumstances in the present case, nor anything which required the judge to dwell particularly upon them in his charge.   A knife was produced and the prisoner led to believe that it was his.   Under this supposition he told where he had hidden his and then told the story of the murder.   The object of evidence is to get at the truth, and a trick which has no tendency to produce a confession except one in accordance with the truth is always admissible.   Society and the criminal are at war, and capture by surprise, or ambush, or masked battery is as permissible in one case as in the other: Com. v. Goodwin, 186 Pa. 218; McClain v. Com., 110 Pa. 263, 269.

The assignments on the subject of insanity may be grouped under three heads, first, the admission of the testimony of witnesses not experts.   These testified to their acquaintance and opportunities of observation of the prisoner, and were then asked whether from such acquaintance they had observed any indications of unsound mind.   It is sufficient to refer to Com. v. Wireback, 190 Pa. 138, on this class of testimony.   Secondly, one of the witnesses so testifying was a physician, and it is objected that the jury would be impressed with that fact in weighing his testimony.   It would be quite proper that they should be.   He was not called as an expert, nor did he testify as such, but as a neighbor who had employed and observed the prisoner. He was competent, and admitted on the same ground as the other class already considered, and his education and practice as a physician merely made it probable that his opinion was more valuable than that of ordinary observers.   Thirdly, it is objected that the judge did not instruct the jury fully on the value of the expert testimony as to the insanity of the prisoner. There was nothing in the testimony that called upon him to do so.   Only two experts were put on the stand, and while their testimony reads like a lecture on moral philosophy, it is wholly destitute of value in a court of justice.   They agreed in calling the prisoner a " degenerate " and a " sexual pervert," though the whole evidence in the case showed that sexual impulse had nothing to do with the killing, and sexual perversion was in no way relevant to the question at issue.   Dr. Gear-

hart testified that the prisoner was " dull mentally " and " weak morally, . . . . would be easily controlled by his emotions instead of by his sense of right and wrong, . . . . has a very low appreciation of the value of human life, and the seriousness of taking human life, . . . . was not capable of careful reflection and due consideration and forming a deliberate intent to do an act of killing this girl." This was as far as he would go, and he explicitly declined to say the prisoner was insane or irresponsible. Except the dull mentality, there probably never was a sane murderer of whom all this testimony might not be truthfully predicated. The other expert, Dr. Mayberry, testified to much the same effect, that the prisoner " seemed to know it was wrong to kill, but in asking him why it was, his answer was because he would be punished if he did," . . . . he was " a moral pervert," etc., but brought squarely to the question, " Do you regard him as being insane ? " answered, " No, sir, I do not." This testimony taken in its broadest sense fell far below the standard required. There was no other on that side, and the judge would have been warranted in giving the jury a binding direction that there was no evidence on which they could find a verdict of not guilty by reason of insanity.

The alleged separation of the jury was one of those incidents that are always guarded against, but cannot always be prevented. At the dismissal of the court, the jury in charge of two tipstaves, one in front and one in rear, passed out of the room by the same door and at the same time as the sheriff with some prisoners, and perhaps some other persons, spectators or members of the bar, and for a few moments all of them were somewhat intermingled while descending the stairs. The court on the motion for a new trial carefully investigated the facts and found affirmatively that nothing was said to or by any of the jurors during the occurrence. The assignment of it here as error is without merit.

The assignments to the charge upon the subject of premeditation and the refusal of the court to direct the jury that they could not find a verdict in the first degree do not require discussion.

Judgment affirmed and record remitted for purpose of execution according to law.