# Commonwealth *v.* Spardute, Appellant.

*Criminal law—Murder—Evidence—Confession—Trick—Accomplices—Cross-examination of witnesses for Commonwealth.*

1. The fabrication of false and contradictory accounts by an accused criminal, for the purpose of diverting inquiry or casting off suspicion, is a circumstance always indicatory of guilt.

2. Evidence that a person charged with murder was heard to acknowledge his guilt to another, is admissible, where such acknowledgment was voluntary and uninfluenced by its surroundings.

3. Where witnesses called by the Commonwealth make statements which are a surprise to it, and which, if accepted unchallenged, aid the cause of defendant, it is not error for the court to permit the district attorney to cross-examine the witnesses, and to ask them whether they had not made previous declarations to him, reciting the declarations, which were in contrast with their testimony in the trial.

4. It does not invalidate a confession that the person who made it was sworn, or even that he was sworn by a person not qualified to take an affidavit.

5. The mere fact that a person is under arrest, or that he is in charge of armed police officers when he makes a confession, does not make such confession involuntary.

6. A trick which has no tendency to produce a confession except one in accordance with the truth is always permissible.

## 38  COMMONWEALTH v. SPARDUTE, Appellant.

7. A statement made by the district attorney to a person charged with crime that it would be better for him to tell the truth, does not invalidate a confession.

8. The fact that, in interrogations propounded to a prisoner, his guilt is assumed, does not affect his confession.

9. Where it is shown by the Commonwealth's witnesses that the confession was made voluntarily, without such threat or inducement as might secure a false confession, it must be admitted; if, afterwards, defendant testifies or produces other witnesses who testify, that it was not voluntarily made, it becomes a question for the jury.

10. Where there is evidence in a murder trial, that the homicide was committed in pursuance of a conspiracy, declarations of the other conspirators, whether made in the presence of defendant or not, are properly received in evidence against him.

11. Those who have joined in a common purpose to commit an unlawful act, the natural and probable consequence of which involves the contingency of taking human life are responsible for a homicide committed by their accomplices in the furtherance of the common object, and this is the case even though the intention was not to kill the deceased.

12. Where the evidence clearly negatives the crime of manslaughter, the court commits no error in refusing to charge with respect thereto.

*Criminal law—Murder—New trial—Charge.*

13. A new trial should not be granted after conviction in a murder case, because of failure of the trial court to instruct the jury that certain of the witnesses were accomplices with defendant, and that their testimony should be carefully scrutinized, where it appears that no request either verbal or written for such instructions was made at the trial, and that it was not among the numerous reasons for a new trial filed by defendant, and it also appears that there was little or no conflict between the stories told by such witnesses and the account given by defendant himself.

Argued April 30, 1923. Appeal, No. 321, Jan. T., 1923, by defendant, from judgment of O. & T. Bradford Co., Sept. T., 1922, No. 5, on verdict of guilty of murder of the first degree, in case of Commonwealth v. Anthony Spardute (alias Tony Spardute). Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART and SCHAFFER, JJ. Affirmed.

1923.] .    Statement of Facts—Opinion of the Court.

Indictment for murder.   Before MAXWELL, P. J.

The opinion of the Supreme Court states the facts.

Verdict of guilty of murder of the first degree on which sentence was passed.   Defendant appealed.

*Errors assigned* were various rulings and instructions, appearing by the opinion of the Supreme Court, quoting record.

*Chas. M. Culver,* with him *A. C. Fanning,* for appellant.—The Commonwealth should not have been permitted to discredit its own witness: McNerney v. Reading City, 150 Pa. 611; Smith v. Price, 8 Watts 447; Stearns v. Merchants Bank, 53 Pa. 490; Com. v. Wickett, 20 Pa. Superior Ct. 350; Peoples Nat. Bank v. Hazard, 231 Pa. 552.

The admission of the confession was improper: Com. v. Harman, 4 Pa. 269; Com. v. Zorambo, 205 Pa. 109; Rizzolo v. Com., 126 Pa. 54.

Taking from the jury the right to consider or render a verdict of voluntary manslaughter was error: Rhodes v. Com., 48 Pa. 396; Lane v. Com., 59 Pa. 371; Com. v. McCloskey, 273 Pa. 456; Com. v. Colandro, 231 Pa. 343.

*W. G. Schrier,* District Attorney, cited, as to the confession: Com. v. Van Horn, 188 Pa. 143; Com. v. Aston, 227 Pa. 112; Com. v. Clark, 130 Pa. 641.

As to the court's instructions as to manslaughter: Com. v. Toth, 145 Pa. 308; Com. v. LeGrange, 227 Pa. 368.

OPINION BY MR. JUSTICE SCHAFFER, June 23, 1923:

Appellant, under sentence to death for the murder of Norman Carmel, brings before us for review the record of his trial, claiming there were such errors in it as to warrant his having another chance for his life.

The case is uncomplicated so far as its principal facts are concerned.   There was a strike of railroad employees

at Sayre in Bradford County. It was ordered by a labor organization, of which defendant had been a member up to about a year prior to the date of the crime. While not actually belonging to the organization at the time of the strike, he took great interest in the strikers' cause, daily reported to their headquarters, and signed a roll there kept, pledging fidelity to the organization and the strike.

It was shown that, on the afternoon prior to the killing, defendant was visited at his home by four of the strikers, one of whom was his brother. These men either there or previously entered into a conspiracy to beat and rob strike-breakers. Conversations took place, the purport of which was, that defendant and the others in the party should go to the near-by town of East Waverly, where strike-breakers were supposed to be, for the purpose of assaulting and robbing them. Defendant denied that he was present when this talk was going on, alleging he was in and out of the room where the visitors were for the purpose of supplying them with cider and wine which he served to them. James B. Kelly, one of the persons in the house and one of those who subsequently went to East Waverly, testified the defendant was present. Whether he overheard and participated in all that was said in the house or not, it was convincingly shown the same subject, that of beating and robbing strike-breakers, was discussed after they departed from the house and when they were on their way to East Waverly, in an automobile, in which defendant sat on the rear seat with two of the other conspirators, his brother and another being on the front seat. While appellant said he did not participate in or hear what was said about the unlawful acts which were to be perpetrated, and that he only went along for the ride, it is manifest, from his nearness to those who were talking, that he must have heard them, as his subsequent conduct shows he acted in concert with them in carrying out what was planned. On arriving at East Waverly, the party left the automobile, loitered around the railroad station

for awhile, and defendant then proceeded along a path
on which the strike-breakers were likely to walk in
coming from their work. None appeared, however, and,
after waiting sometime, the party proceeded in the auto-
mobile to Sayre, where the railroad shops of the Lehigh
Valley Railroad Company are located, which was the
central point of the strike. Arriving there, defendant
left the automobile and sat in a public park, the others
who had been with him remaining in the vicinity.

About nine o'clock in the evening, it became noised
about that deceased, who was working for the railroad
company and had refused to strike, was eating in a
restaurant near the park. Two of the men who had gone
on the automobile trip, Kelly and DePasquale, entered
the restaurant to endeavor to persuade the deceased to
abandon his work. They were unsuccessful in this, came
out of the restaurant and announced to those who were
standing near, a considerable crowd having congregated,
defendant being in it, that the man in the restaurant was
a strike-breaker and that he would not give up his em-
ployment. It was testified that at this time defendant
spoke of the deceased as a "scab." In a short while,
deceased emerged from the restaurant and started down
the street followed by defendant and a number of the
strikers. When a place was reached where it was dark,
he was set upon, beaten and fatally stabbed.

Defendant admits he was one of those who pursued the
deceased and that he was within twenty-five feet of him
when the assault took place; that he stopped to pick
something up, which turned out to be a piece of manure;
just then, and while the affray was in progress, someone
called that the state troopers were coming. The partici-
pants ran from the scene and two of them were joined by
defendant, who was seen by others running away. The
subject of the assault on the deceased was talked over by
appellant and these two men, after they left the scene,
and he invited them to go to a near-by hospital, where he
was employed in the laundry; there they all washed their

hands.   After doing so, the trio separated, defendant going to his home.   Subsequent to his arrest, a coat, identified as having been worn by defendant on the night of the murder, was found.   There was blood in the inside pocket, which had hardened; on it was an imprint in the form of a knife blade.   In his confession, defendant said he carried the knife, with which he did the stabbing, in his inside coat pocket.   The next day after the murder, defendant returned to work in the hospital, was there taken into custody and removed to the headquarters of the state constabulary in a hotel in Sayre; he was detained, either there or in the town lockup, for two days, without seeing anyone except those investigating the crime.   While so held, he confessed his guilt.

The principal battle in the case and before us is over this confession, defendant contending that it was made involuntarily and the Commonwealth that it was freely given.   The circumstances connected with it are that, after the accused was taken to the headquarters of the constabulary, he was interrogated by the district attorney, by members of the state constabulary, the coroner, the sheriff and detectives, as to his connection with the murder.   He at first denied all participation in it and said he knew nothing about the matter until the next day, when a newspaper was read to him.   Subsequently, he was asked if he wished to make a statement under oath, and, on his assenting, he was sworn by the court stenographer.   While this official had no authority to administer an oath, we will treat it as though he had, because the defendant evidently so thought.   After being sworn, the district attorney warned defendant that he need not make any statement, that no promise of any kind could be held out to him and that whatever he might say would be used against him on trial.   He was asked whether anyone had promised him anything to make a statement and he answered no.   In his first narration after being sworn, he denied the visit made to him on the afternoon of the murder by his brother and the others

and the trip to East Waverly, accounting for his presence elsewhere on that afternoon, and for his being in the park, and in the vicinity of the restaurant, as a chance matter, and denied all connection with the killing. This first statement was untrue in all material respects, as was what he said before being sworn. ("The fabrication of false and contradictory accounts by an accused criminal, for the sake of diverting inquiry or casting off suspicion, is a circumstance always indicatory of guilt": Cathcart v. Com., 37 Pa. 108, 113; McMeen v. Com., 114 Pa. 300, 306.) After he had denied the visit to East Waverly, the others of the party whom he had accompanied there were produced before him and interrogated in his presence; they told the true story of what had taken place on that afternoon. Upon hearing this and being urged by the district attorney and the other officials to tell the truth, and after having been accused by them of lying and after allegations made to him by them of certain evidence in their possession, which were false, among others, that they had the knife with which the killing was done, defendant, in answer to interrogations which assumed his guilt, admitted his trip with the others to East Waverly, that they had gone for the purpose of attacking strike-breakers, that he had participated in the assault on the deceased and had stabbed him with a sharp instrument, which he, the defendant, had made and which he had thrown away as he was running from the scene of the crime and which has not been found. Of this instrument, he volunteered to draw a picture, which appears in the record identified with his signature. The suggestion that the picture be drawn was not made by the district attorney, but by defendant himself. When confronted with this picture and his signature to it at the trial and asked as to his recollection of drawing it, he answered he could not remember whether he did or did not. After he had concluded his statement to the officials, appellant sent for his brother and was overheard acknowledging his guilt to him. This confession had

nothing to do with the previous one, was uninflu-
enced by its surroundings and was clearly admissible.
Shortly thereafter, appellant asserted that Kelly, one
of the men who had gone into the restaurant, was re-
sponsible for the crime, saying that if he had not done so,
it would not have occurred. On the trial, defendant,
when questioned as to his confession, said in substance
that he did not remember having said anything in the
statement he had made which indicated his guilt. He
admitted that his first story was untrue and said he had
told it because the two men he had met after the assault
on the deceased had told him to keep his mouth shut.

The questions defendant puts before us are: (1) Was
his confession admissible and was the determination of
whether it was voluntary for the court or for the jury;
appellant contends it was for the court and that it
should have been excluded; (2) Were declarations of his
coconspirators, not made in his presence, admissible
against him, and, in this connection, were conversations
between them and the deceased admissible? (3) Was it
proper to permit the district attorney to put leading
questions in the nature of cross-examination to some of
his own witnesses and to confront them with previous
declarations made to him out of court and which were
not in agreement with those made on the trial? (4) Was
the charge fair to the defendant? (5) On an indictment
for murder, is it permissible to instruct the jury that
under the proofs they should not render a verdict of
manslaughter, but one of either first or second degree
murder, or not guilty?

We will dispose of what we regard as minor conten-
tions first: The right of the district attorney to cross-
examine and contradict his own witnesses. This was a
matter within the sound discretion of the trial judge. It
appeared to his satisfaction, as it does to ours, that the
witnesses called by the Commonwealth had made state-
ments which were a surprise to it and which, if accepted
unchallenged, aided the cause of the defendant. Under

these circumstances, it was not error for the court to permit the district attorney to cross-examine the witnesses and to ask them whether they had not made previous declarations to him, reciting the declarations, which were in contrast with their testimony on the trial: Com. v. Reeves, 267 Pa. 361; 1 Wharton on Criminal Evidence, 10th ed., sec. 454a, p. 950; Underhill on Criminal Evidence, 2d ed., section 212, p. 388; 1 Wigmore on Evidence, section 774, p. 867.

On the alleged bias in the charge, it is sufficient to say that we have read it with scrupulous care and do not reach the conclusion that it was unfair to appellant. It gave full weight to his confession, provided the jury believed it was made voluntarily; it was proper that these instructions should so do.

As before stated, the great question in the case is whether the confession, considering the circumstances under which it was made, was voluntary. Defendant's counsel strongly insist that the confession should not have been admitted because it was not voluntary, because he was sworn, because he was being held in custody at the time and was denied the right to procure counsel, because misrepresentations were made to him by those having him in charge, because he was accused by them of lying and advised that it would be better to tell the truth, and because it was the result of browbeating and so-called "third degree" methods used by the district attorney and the other persons coöperating with him in the investigation of the crime. Our reading of what took place at the time the confession was made, at both examinations, when it was reduced to writing by the stenographer, and of what occurred between the defendant, the public prosecutor and the others acting with him, does not substantiate the charges, either that the defendant was browbeaten or that he was subjected to the methods alleged, to bring from him a confession. All of the evidence given by those who were present when he made his various statements shows that he was cool and

self-possessed, although he alleged on his trial he was not. The most that could be said to justify the allegation that he was browbeaten is that the district attorney at times questioned him in a loud tone of voice, but there were no other of the attributes of terror or coercion made manifest. While defendant sets up that he was denied food and water, that he was compelled to stand for a long period while his examination was going on and that he was made sick by the water which he finally did drink, insinuating that something was put in it, the evidence of all other persons present at the time is that these circumstances did not occur, that he was given food and water and in no way terrorized or coerced. It is admitted misrepresentations as to the evidence which the Commonwealth had against him were made to him, he was accused of lying and his guilt was assumed by those who questioned him. While it is true he became sick and vomited in the lockup after his examination, the testimony of other persons is that they drank the same water and were in no way affected. If he had made a request for counsel and had been denied the right to send for a lawyer, this would have been a grave infraction of his rights, particularly in view of the fact that he was held by the state police for two days, during which no one other than those engaged in the Commonwealth's quest for evidence saw him; they, however, denied that any such request was made. When he asked to see his brother, the latter was promptly communicated with and admitted to converse with him. It is manifest to us, from our reading of the record, that what happened was, defendant, having made false statements as to his whereabouts on the afternoon of the crime, was confronted by those who were with him at that time, who said in his presence he had accompanied them on the trip to East Waverly, and this brought about the breakdown of the defendant's story and his admission of guilt. It is further set up that he thought what took place while he was being interrogated and the other persons

produced before him was in reality a trial in which he had been condemned. It may have been a little difficult for the jury to credit this statement, in view of the fact that the defendant had been in this country for many years, during which he had participated in at least one other court proceeding.

It did not invalidate his confession that he was sworn: Com. v. Clark, 130 Pa. 641; Williams v. Com., 29 Pa. 102. His counsel do not contend the circumstances that he was sworn in itself renders the confession inadmissible, but that what took place afterwards renders it so. The case in hand is entirely different from Com. v. Harman, 4 Pa. 269, in which the prisoner, charged with homicide, was taken before a committing magistrate and sworn; the magistrate saying to her, "If you do not tell the truth, I will commit you." It was held because of this threat her confession was inadmissible.

"The mere fact that the defendant was under arrest, or was in the charge of armed police officers when he made his confession, will not make a confession involuntary": Underhill on Criminal Evidence, 2d ed., section 129, p. 249.

Although misrepresentations were made to him, this would not affect the integrity of his confession. "The fact that it [a confession of murder] was obtained by a trick is no objection to its competency, unless the circumstances are such as to suggest an inference that through fear or hope a false confession may be made......A knife was produced and the prisoner led to believe that it was his. Under this supposition he told where he had hidden his and then told the story of the murder. The object of evidence is to get at the truth, and a trick which has no tendency to produce a confession except one in accordance with the truth is always admissible. Society and the criminal are at war, and capture by surprise, or ambush, or masked battery is as permissible in one case as in the other": Com. v. Cressinger, 193 Pa. 326, 336; Fife v. Com., 29 Pa. 429, 435; Underhill on

Criminal Evidence, 2d ed., section 135, p. 261; 2 Wharton on Criminal Evidence, 10th ed., section 670, p. 1378; 1 Wigmore on Evidence, section 841, p. 957.

The statement by the district attorney that it would be better to tell the truth did not vitiate the confession. "The advice by any person whatever that it would be better to tell the truth cannot possibly vitiate the confession, since, by hypothesis, the worst that it can evoke is the truth, and there is thus no risk of accepting a false confession": 1 Wigmore on Evidence, section 832, p. 946; 2 Wharton on Criminal Evidence, 10th ed., section 647, p. 1344; Rizzolo v. Com., 126 Pa. 54, 72.

The fact that in certain interrogations his guilt was assumed did not affect his confession: McClain v. Com., 110 Pa. 263, 269.

Under the facts here appearing, the court properly left it to the jury to determine whether the confession was voluntary. The contention of appellant is because of the circumstances heretofore recited in connection with the confession the court should have excluded it. We think all that appeared in the Commonwealth's case, the fact that he was in custody, that he was sworn, that misrepresentations were made to him and that he was advised it would be better to speak the truth, did not invalidate the confession. What he or his witnesses testified to respecting it only carried to the jury the question whether it was voluntary. Where, by the Commonwealth's witnesses, it is shown that a confession is made voluntarily, without such threat or inducement as might secure a false confession, it must be admitted. If afterwards the defendant testifies, or produces other witnesses who testify, that it was not voluntarily made, it becomes a question for the jury: Com. v. Aston, 227 Pa. 112, 115, 116; Com. v. Shew, 190 Pa. 23, 24; Com. v. Epps, 193 Pa. 512, 515; Com. v. Van Horn, 188 Pa. 143, 168; Com. v. Shaffer, 178 Pa. 409, 414; Volkavitch v. Com., 9 Sadler 327; Underhill on Criminal Evidence, 2d ed., section 126, p. 242.

The subject of the conversation at defendant's house and on the way to East Waverly was the beating and robbing of strike-breakers. Within a few hours after these conversations by men who took part in them, the purpose which led to the trip to East Waverly was carried out by defendant and some of those who accompanied him there in the beating and stabbing of the deceased. . Under these circumstances, no other conclusion could reasonably be reached than that the action of the defendant, and those who joined him in the assault, was in pursuance of the conspiracy; this being so, declarations of the other conspirators, whether made in defendant's presence or not, were properly received in evidence against him.

When a conspiracy is shown, all the acts and declarations of the coconspirators, made during the carrying out of the plan, are admissible against one of the conspirators. Declarations of coconspirators may be introduced in a prosecution for conspiracy to commit a murder: 1 Ruling Case Law 518. "That the accused was not present when the declaration, which is introduced against him, was uttered by a fellow conspirator, does not of necessity render it incompetent if it conforms to the rule in other respects": Underhill on Criminal Evidence, 2d ed., section 493, p. 799. "Where, although no conspiracy is charged, it is made to appear that there was concerted action between codefendants, the acts and declarations of one are admissible against the other": 16 Corpus Juris 647. In Commonwealth v. Biddle, 200 Pa. 640, three men planned to commit a burglary. They went to the store which they had in mind and, while two of them remained outside, one went into the store and obtained information from the owner while pretending that he was securing data for a directory. That night while attempting the burglary a murder was committed. On trial, the one who went into the store was allowed to testify as to the conversation there. The situation in the instant case as to the admission of evidence of what oc-

curred between the deceased, Kelly and DePasquale in the restaurant parallels what happened in the case last cited.

At one point in his examination, the defendant admitted he took part in the assault on the deceased and hit him with a stone. If he did take part in the assault which resulted from the conspiracy to beat and rob strike-breakers, then whether he actually inflicted the fatal stab on the deceased is immaterial in determining his guilt. "Those who have joined in a common purpose to commit......a robbery......[are] responsible for a homicide committed by their accomplices in the furtherance of the common object": 29 Corpus Juris 1074; Com. v. DeLeo, 242 Pa. 510; Com. v. Murrano, 276 Pa. 239. Even though the intention was not to kill the deceased, defendant, participating in the assault on him, would be responsible for the consequences of it. "There may be responsibility for a homicide committed in the execution of a common design, although the plan did not involve taking life. All who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuance of, or in furtherance of, the common design, although not specifically contemplated by the parties, or even forbidden by defendant, or although the actual perpetrator is not identified": 29 Corpus Juris 1073; Com. v. Murrano, 276 Pa. 239.

The court in its general charge instructed the jury that the defendant was guilty, if at all, of murder of the first or second degree, but not of manslaughter, saying: "After a review of the evidence, I find nothing in it which would justify you in rendering a verdict of voluntary manslaughter; therefore under the evidence in this case you may find the defendant guilty of murder of the first degree, murder of the second degree, or you may acquit him of all the charges against him." The court also

refused points submitted by defendant asking instructions on the subject of manslaughter, saying that, in his opinion, under the facts shown, the question of manslaughter did not arise. There was no error in this. "Where the evidence clearly negatives the crime of manslaughter, the judge is under no obligation to charge the jury on that grade of homicide": Com. v. Newson, 277 Pa. 48. In Com. v. Morrison, 266 Pa. 223, 230, we said: "The trial judge charged the jury that after a review of the evidence he could find nothing which would justify them in returning a verdict of voluntary manslaughter, and the jury might find a verdict of murder in the first or second degree, or might acquit the defendant. It is now urged this was an erroneous instruction as it took away from the jury its statutory duty of ascertaining the degree of the crime......But where there is no evidence which in the least degree points to the offense of manslaughter, the court does not commit error when it refuses to charge with respect to manslaughter." To the same effect are Com. v. Gibson, 211 Pa. 546, 548; Com. v. LeGrange, 227 Pa. 368, 369; Com. v. Pava, 268 Pa. 520, 525; Com. v. Sutton, 205 Pa. 605, 606.

On the argument before us and in the court below for a new trial, defendant's counsel alleged error because of the failure of the court to instruct the jury that certain of the witnesses were accomplices with the defendant in the crime and that their testimony should be carefully scrutinized by the jury. No request, either verbal or written, for such instructions was made at the trial and failure to so instruct by the trial judge was not among the fifty-one reasons for a new trial filed by the defendant. As a matter of fact, the necessity for such instructions very likely did not occur to his counsel on the trial, for the reason that, with the exception of the actual stabbing of the deceased, there was little or no conflict between the stories told by the other actors in the tragedy and the accused. On the trial, he did not deny the trip to East Waverly or his presence within a

few feet of the murder. None of the so-called accomplices testified that they saw him stab the deceased, or that he admitted to them he had done so; there was therefore no occasion for such instructions because of lack of conflict between their testimony and his.

We have examined all the assignments of error and given our most thoughtful consideration to the earnest presentation of appellant's cause by his counsel; we think none of the assignments shows reversible error and they are all overruled.

In accordance with the duty placed upon us by the Act of February 15, 1870, section 2, P. L. 15, we have carefully read the entire record, in order that we may determine whether it convincingly demonstrates there are present in it the ingredients necessary to a conviction of murder of the first degree; we are satisfied they are established by the proofs and therefore the judgment is affirmed.

The record is remitted to the court below for the purpose of execution.