## Commonwealth v. Green.

*Criminal law—Murder—Evidence—Dying declarations.*

1. A dying declaration may be partly oral and partly written. The fact that it had been reduced to writing will not preclude evidence of unwritten declarations made on other occasions.

2. A dying declaration communicated by signs, as by nodding the head in assent, may be received in evidence, although the deceased subsequently made verbal communications.

3. It is not necessary, in proving a dying declaration, to call all the witnesses who were present when it was made.

4. A notary who took the affidavit of the declarant need not be called, if there were other witnesses to the declaration.

5. While declarations made in the presence of the accused may not be admissible for some reason as dying declarations, they are admissible to show the conduct of the accused charged with murder.

*Murder—Degree—Evidence—Deadly weapon.*

6. The fact that a death was caused by the use of a deadly weapon is sufficient to permit the jury to say whether or not under the evidence there existed "a wilful, deliberate, premeditated intention to take the life of the deceased."

7. Where a deadly weapon was used, the burden is on the accused to reduce the crime from murder to manslaughter.

8. Where there is no evidence in the case to reduce the crime to manslaughter, and where the evidence clearly negatives such crime, the trial judge is under no obligation to charge the jury on that grade of homicide.

Motion for new trial. Q. S. Phila. Co., Aug. Sess., 1927, No. 60-61.

*Charles C. Gordon,* for Commonwealth; *Harry Shapiro,* for defendant.

KUN, J., Dec. 15, 1927.—The defendant, Addis Green, was convicted of murder in the second degree of Adelphia Pinn, who was mortally wounded by gunshot in the early morning of June 20, 1927, as a result of which she died some nine days thereafter.

The Commonwealth did not press for a first degree verdict, although it seems that wherever death is caused by the use of a deadly weapon, it is for the jury to say, under the evidence, whether or not there existed "a wilful, deliberate and premeditated" intention to take the life of the deceased: Abernethy *v.* Com., 101 Pa. 322.

A verdict of murder in the first degree may have been justified in this case.

The Commonwealth showed that, in the early morning hours of June 20, 1927 (shortly after midnight), the defendant was heard "fussing" in the second-floor hallway of the house in which the deceased had a room, and while the voice of the other person was not identified, defendant's voice, known to the witness, was. The witness referred to the talk as a "disagreement." In

answer to the question "They were quarreling?" the witness said: "Yes, a kind of little fuss." In the examination, the district attorney characterized it as quarreling, but, on cross-examination, the witness stated that the disagreement, or fuss, or quarrel, whichever characterization might be applied, was not very loud. Following this disagreement, fuss or quarrel, the witness heard a gunshot. At the hospital, to which the deceased was taken, she told a detective that the defendant had shot her.

The detective went to the defendant's home, but he was not there. The detective waited there. Shortly, a taxicab drove up, and the man in it advised the detective that the defendant (a married man) sent him to his home to get a raincoat for him. This was about 2 or 3 o'clock A. M. The detective, conceiving it as a means of apprehending the defendant, got into the taxicab and was driven to the place where the defendant was waiting, and, when the cab arrived there, got the defendant's friend to whistle for him, which brought the defendant downstairs to the hallway, where he was put under arrest and taken at once to the hospital, where, according to the Commonwealth, the deceased confirmed the charge that the defendant shot her, and her dying declaration was made and signed by her to the effect that the defendant had come to see her that night, that they had been drinking, and that they "got arguing over a woman," and defendant pulled out his pistol and shot her.

The defendant denied the act. He admitted that he had been with the deceased and had been drinking with her. He claimed to have gone to the house also to visit his mother, who had a room on one of the upper floors. He claimed that, after drinking and spending some time with the deceased, a man came in and struck him (the defendant) and he left the house; that he had gone but a short distance when he heard a shot. He did not return to the house or to his own home, but went to the other place, where he was arrested under the circumstances above referred to.

A witness living in the house adjoining the one in which the shooting occurred testified that, after the shooting and some noises incident thereto, which awakened him, he came down to his front door and looked out and saw a man going down the street with a revolver in his hand, but he was not the defendant; that it was some time after midnight; that it was drizzling, but there was a lamplight across the street. This witness testified that he was under the impression that the defendant had lived next door to him, that is, the place in which the shooting took place, because he saw him around there so frequently.

Defendant's mother testified that the day before the deceased died she visited the decedent at the hospital, and the deceased thought she had recovered and was going to leave the hospital the next day. The witness said the deceased told her that she would not prosecute her son, the defendant, or words to that effect. The court left it to the jury to say whether this alleged contradiction of the deceased's previous charge against the defendant and her dying declaration was really a contradiction of them or whether it was made by the deceased, who was under the impression that she had recovered, with the hope and expectation of renewing the friendship, or other relationship, whatever it may have been, with the defendant, a married man.

Following the rendition of the verdict of murder in the second degree with a recommendation of mercy, a disagreement arose between counsel for the defendant, one stating that the defendant had had a fair trial, especially in view of the recommendation of mercy connected with the verdict, but the other being of the opinion that some legal errors may have been committed, was given leave to file motion and reasons for new trial.

Some twenty-five reasons have been assigned in the motion for a new trial. After a careful review of the record in the case and the arguments of counsel, the court has concluded that the defendant has had a full and fair trial on the charge against him, and the verdict is amply justified by the evidence in the case. Indeed, there are elements in the case which might have justified a first degree verdict.

Specific reference will be made to only two of the reasons assigned. It is contended that the court erred in admitting the dying declaration of the deceased in evidence because the notary public before whom it was sworn to and attested was not called at the trial to prove it.

The evidence in the case showed that the deceased had made her dying declaration to the detective that the defendant had shot her, whereupon the detective, in the manner above referred to, apprehended the defendant and brought him to the bedside of the deceased. The defendant testified that when he was brought into the room he said to the deceased, in effect, "you know I did not shoot you," but deceased did not respond to that self-exculpation. The detective thereupon said to the deceased, in effect, "you know you told me that this man shot you," whereupon the decedent nodded her head in assent. There was no denial by the defendant after that, although the defendant, according to his story, said, in effect: "What is the matter with her; is she paralyzed? Can't she talk?" According to the evidence, the dying declaration was then reduced to writing and the deceased signed it with her cross, and it was attested before a notary public. This was all done in the presence of the detective, who testified that both the oral and written declarations were made in his presence. It seems to the court that it was entirely unnecessary under the circumstances to call the notary. It is immaterial in what form a dying declaration is made. It need not be in writing. It may be partly oral and partly written. The fact that a dying declaration has been reduced to writing will not preclude evidence of unwritten declarations made on other occasions. A dying declaration communicated by signs (this refers to the deceased nodding her head in assent) may be received in evidence, although the deceased subsequently made verbal communications: 30 Corpus Juris, 258, et seq. (§ 500), citing cases.

It is not necessary in proving a dying declaration to call all the witnesses who were present when it was made: 30 Corpus Juris, 271, citing State v. Johnson, 76 Mo. 121.

Moreover, the declaration in this case was made in the presence of the accused, and, although it may not have been admissible for some reason as a dying declaration, it was undoubtedly admissible to show the conduct of the defendant charged with the murder.

The other assigned reason in support of the motion for the new trial which will be referred to is that the trial judge failed to charge the jury on manslaughter.

As stated, the fact that a death was caused by the use of a deadly weapon was sufficient to have permitted the jury to say whether or not under the evidence there existed "a wilful, deliberate, premeditated intention to take the life of the deceased:" Abernethy v. Com., 101 Pa. 322.

The presumption is that it was murder. The burden is upon the Commonwealth to raise the grade of the crime to first degree, and, on the other hand, in such circumstances, the burden of reducing the crime from murder to manslaughter is on the defendant: Com. v. Drum, 58 Pa. 9.

He might show that the killing was in hot blood on sufficient provocation, or that he committed the act during an affray or fight, under all the surround-

ing circumstances of which, though he did not so contend, the jury might feel warranted in rendering a verdict of manslaughter; or the circumstances in the case may be such as to possibly warrant the finding of manslaughter: Com. v. Marcinko, 242 Pa. 388.

In the instant case, the defendant not only denied the act, but denied being present when the shooting occurred. The mere reference in the course of the testimony of the Commonwealth's witness, by whom it was sought to prove that the defendant was at the scene of the shooting immediately before it occurred, to an alleged "disagreement" or "little fuss" which the defendant had with some one, which, in the examination, was characterized by the district attorney as a quarrel, but which the witness, on cross-examination, said was not loud and not enough to disturb any one, created no situation to warrant any contention that there was any basis in the case for the reduction of the crime from murder to manslaughter, and it was not so contended at the trial. Where there is no evidence in the case to reduce the crime to manslaughter and where the evidence clearly negatives such crime, the trial judge is under no obligation to charge the jury on that grade of homicide: Com. v. Newson, 277 Pa. 48; Com. v. Spardute, 278 Pa. 37.

The motion for new trial is refused.