## Commonwealth *v.* Mamulo, Appellant.

Argued September 25, 1933. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Jacob Shulgold,* with him *Francis L. McFarren,* for appellant.

*Earle R. Jackson,* Assistant District Attorney, with him *Andrew T. Park,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, November 27, 1933:

At 12 : 25 p. m., December 6, 1930, Charles McFarland, cashier of the Allegheny Valley Trust Company of Verona, was shot and killed in that bank by a man perpetrating a robbery. One Matt Hadok was arrested fourteen months later and identified and convicted as the murderer. See Com. v. Hadok, 313 Pa. 110. The defendant Mike Mamulo was also named in the same indictment as the murderer of McFarland, the contention of the Commonwealth being that Hadok and Mamulo were accomplices in the crime. Mamulo was convicted of voluntary manslaughter.

The evidence against Mamulo was less convincing than the evidence against Hadok and the question before us is whether there was sufficient evidence against Mamulo to submit to the jury. At the close of the Commonwealth's case defendant's counsel unsuccessfully moved for a directed verdict.

Gladys Smith, an employee of the trust company, testified that she ran after the bandit who shot McFarland and followed him until she saw him jump on the running board of an Essex car which she described as "coming along real slow," and that she saw him a little later "sitting in with the man" (meaning evidently the driver). She then saw Filmore Simpson coming in a car and she screamed to Simpson: "Get him, he robbed the bank." Simpson then turned and followed the Essex car. She could not identify the defendant Mamulo as she saw only the back of the man who was driving.

Simpson, who on the day of the homicide was about seventeen and a half years of age, testified that he followed the Essex car at a distance of about eighty feet.

The car contained two people. When the car reached Jones Street, Verona, it turned to the right near where there was a garage and then Simpson "saw the white shirtsleeves of a man going behind this garage." At that time there was only one man in the Essex car (evidently one of the two men previously in the car had alighted from it). Simpson started to make a "U" turn behind the garage so that he could go to the police station, and he then saw Matt Hadok, who, the witness said, "turned his head real quick, looking for some place to hide" (so the witness said he "imagined"). Simpson's car moved slowly in making the turn and Hadok entered the car and ordered him to "get going." Hadok urged Simpson to go faster and pressed a gun against his side, telling him to drive to Pittsburgh. Before the car got out of Verona, Simpson alighted from the car and told Hadok to take it. In a little while Simpson saw the same Essex car that he had previously followed. The car pulled into a gas station and its driver asked Simpson "which way this man had gone," meaning the man Simpson had followed. Simpson answered the inquiry and told him which way the man had gone and "asked him if he had pulled a gun on him." The inquirer replied, "Yes," that "the man made him drive and he didn't want to." Simpson testified that he "believed the inquirer went the same way the robber did," although he "could not say for sure which way he went." Simpson fourteen months later at the Verona police station identified the inquirer as the defendant Mamulo, and on the stand he said he recognized Mamulo as soon as he saw him, that he noticed both on the day of the homicide and at the time of the identification that Mamulo "had some teeth out in front, and his teeth were real yellow."

R. J. Baird, another witness, testified that shortly after the homicide, he saw a man, who at the time of the trial he identified as Matt Hadok, run down Diamond Alley to South Avenue, that he followed him at a distance of about seventy-five feet, that the fugitive turned

right onto South Avenue, and when he got onto East Railroad Avenue, the witness saw him "run around the front of an Essex coach and get in beside the driver." The witness obtained a side view of the driver but could not identify him. He testified that the Essex car was not moving at that time but "the minute he [Hadok] hit the running board, it started up."

Fourteen months after the homicide the defendant and Matt Hadok were arrested while in each other's company at Rankin, Pa. They had come there in a car bearing an Ohio license. They informed the chief of police that their home was Youngstown, Ohio. When arrested the defendant Mamulo gave the name of George Turtley, but shortly afterwards gave the officer his correct name and explained to him that he had given the name of Turtley because the latter had loaned him his car and driver's license.

The Commonwealth's testimony supports its theory that Hadok, the murderer of McFarland, had an accomplice who was waiting for him in an Essex car at an appointed rendezvous. The testimony that "the car was not moving until Hadok hit the running board" is particularly significant. If the driver of the Essex car had had no connection with Hadock and the latter had prevailed upon him by menaces to drive the car, it is not likely that the car would have started the moment the murderer reached it. An innocent person suddenly commanded by a bandit to start his car or motor would in all probability be so stunned by the sudden command that he could not start the car the moment the command was received. The fact that the car was started at exactly the right moment for Hadok indicates a criminal privity between him and the driver. The defendant's eager curiosity later to ascertain "which way" the fleeing Hadok had gone indicates some desire on his part to join him. At least he expressed to Simpson no desire for the fugitive's apprehension. Furthermore, Mamulo's statement to Simpson (in reply to Simpson's inquiry)

to the effect that the fugitive had pulled a gun on him and made him drive the car is in itself inherently improbable. If Hadok had pulled a gun on Mamulo and had made him drive the car, it is not likely that Mamulo would have been able to divorce himself *and* his car so quickly from Hadok. Both would probably have left town in the car and at a high rate of speed. If Hadok had commandeered Mamulo's car, he probably would not a little later have commandeered Simpson's car. Although Hadok was in Mamulo's car shortly after the homicide, he evidently thought when he found that he and Mamulo were being followed, that they had better separate. This would be the natural thing for them to do if they were accomplices in a recent crime. If they had *not* been accomplices, Hadok would in all probability have remained in Mamulo's car and directed him, as he later directed Simpson, at the point of a gun to drive rapidly.

The inference is legitimate from the evidence in the case that Hadok, the robber-murderer, had an accomplice and that this accomplice was waiting for him, and that he got into the accomplice's car, and finding himself pursued he alighted from that car and shortly afterwards commandeered another car in which to get out of town. The defendant's identity as the driver of the waiting Essex car was sufficiently explicit to carry the question of the identity to the jury. The Commonwealth showed the defendant in apparent criminal privity with the murderer very shortly after the homicide, and also showed the defendant and Hadok in close association at the time of their arrest, when they were many miles from the Ohio city which they claimed was their home.

The evidence as to the defendant's criminal connection with Hadok at the time of the homicide, if credited by the jury, cannot be dismissed as unsubstantial, or as evidence sufficient to support merely a conjecture as to the defendant's guilt. This evidence and the legitimate inferences from it amounted to substantial evidence tend-

ing to sustain the indictment, and its submission to the jury was justified. The conclusions and tests of everyday experience would lead a reasonable person to believe after accepting Simpson's identity of the defendant (and the question of identity was for the jury) that the defendant was waiting in his car at an appointed place for Hadok to return from the bank with the fruits of his robbery and to help Hadok make his escape. "The conclusions and tests of everyday experience must control the standards of legal logic" (Wigmore (2d ed.), volume 1, section 27, page 232), and these standards were not departed from when the case was submitted to the jury.