Com. of Pa. *v.* Peck, Appellant.

Argued March 5, 1934.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ. Affirmed.

*William A. Valentine,* for appellant.

*Thomas M. Lewis,* District Attorney, and with him *John H. Dando,* Assistant District Attorney, for appellee.

OPINION BY TREXLER, P. J., May 8, 1934:

Otto Peck, the appellant, and others were indicted for conspiracy. The charge was that they combined together to cheat and defraud the Bank of the Manhattan Company of the City of New York by forging three checks and uttering and passing the same. They were found guilty.

Otto Peck comes before this court, as he did before the lower court, claiming that there was not sufficient evidence to convict him. There was no question about the checks being forged and that they were deposited in banks in the vicinity of Wilkes-Barre and, in pursuance of the conspiracy, an attempt was made to realize on them. The reading of the testimony sustains the conclusion reached by the jury that Peck was consorting with the other defendants and must have known of their plans and connived with them in the attempt to secure the money.

The scene begins on Saturday, September 9, 1933, where Blumenthal, one of the defendants, was at his

cottage at Harvey's Lake near Wilkes-Barre. Alpert and Peck came in a car in front of the cottage, entered, and about fifteen minutes later drove to a boarding house at the lake not far distant and remained over night, accommodations having been secured for them by Blumenthal. The next day, Sunday, Williams, another defendant, called on Blumenthal and they both joined Alpert and Peck at their lodging house. That same afternoon, Alpert, by telephone to the Western Union office in Wilkes-Barre, wired to Brenner, a defendant, in New York to call him by 'phone and reverse the charges. Brenner complied. He requested him to come to Wilkes-Barre the following day, Monday, and Brenner replied that he had no money and Alpert agreed to wire it.

Later Williams left the lake in Blumenthal's car, followed by a car driven by Alpert and all trailed to Williams' home in Wilkes-Barre. The three entered and in a few minutes, Alpert emerged and drove to the Western Union office and wired money supplied by Williams to Brenner, directing him to leave on the 8:00 o'clock bus Monday morning for Wilkes-Barre. Alpert returned to Harvey's Lake and joined Peck.

On Monday, about noon, upon the arrival of the bus from New York City, Blumenthal and Alpert met Soronson, the payee in two of the checks, known to Alpert as Brenner. They entered a restaurant and had lunch. Alpert passed a paper to Brenner, being one of the forged checks. Alpert then drove Brenner to the Kingston Bank & Trust Company where he deposited another forged check in the name of Anthony Soronson, leaving it there for collection. He left the bank and entered the car and was driven to the boarding house at Harvey's Lake and joined Peck.

The next day, Tuesday, September 12th, Alpert drove Brenner, Peck and a woman, who was with Peck, to New York City and then arranged to pick up Peck

at 52nd Street and Broadway on Thursday morning at 3:00 o'clock, where Spillman, another defendant, conducted a restaurant. The engagement was kept. Alpert drove Peck and Brenner to Scranton, arriving at the Casey Hotel where they met Blumenthal and Williams from Wilkes-Barre, and afterwards Spillman and Leonard, defendants, who had left New York City the same day at 7:30 A. M. Leonard, the defendant, arranged by telephone to make a deposit in the First National Bank at Shickshinny before the bank closed. Alpert drove Williams and Leonard to Shickshinny. Williams entered the bank, made some mention about passing through the town and that he had stopped in for some blank checks and Leonard stepped to the cashier's window and deposited for collection the check for $14,008, payable to Samuel Morrison and which Leonard endorsed as such, received a bank book, and the three returned to Wilkes-Barre. The other defendants were driven by Blumenthal from Scranton to Wilkes-Barre and all the defendants met at Fuerth's Cafe on South Main Street in Wilkes-Barre, and lunched there. From there Brenner, Spillman, Alpert, Williams and Blumenthal went over to the bank at Kingston to withdraw $7,000 on the check deposited there and also to put in another forged check for $4,270. Peck and Leonard remained at the restaurant. The five were arrested at the Kingston Bank. Upon Williams was found the bank book covering the Shickshinny deposit and upon Brenner was found the forged check for $4,270. Was there sufficient evidence to submit the question of Peck's guilt to the jury? The answer is given in the opinion of the lower court refusing a new trial, who comments upon the facts above referred to.

"His [Peck's] going to New York Tuesday morning and returning at 3 A. M., the following Thursday, contradicts his statement that he came to Harvey's Lake to remain a week for recuperation. The meet-

ing on Sunday afternoon at the boarding house with three of the defendants, Alpert wiring money received from Williams to bring Brenner by bus, and being met by Blumenthal and Alpert, and the deposit of the check for $4,212 soon after his arrival in the Kingston Bank, convinces us that Peck was in the plot. Where did Alpert get the check? Did he receive it from Peck, Williams or Blumenthal, or from all? Immediately after its deposit in the bank, Alpert drove Brenner to the lake, Peck still there, and the following morning, Alpert, Brenner and Peck drove to New York and arrange to meet on Thursday morning at 3 A. M., Brenner coming back to draw $7,000 from the Kingston Bank.

"A significant inquiry is, why was Peck returning with Brenner who deposited the check and coming back for the purpose of drawing $7,000 and in Brenner's possession a forged check for $4,270 to be deposited the same day. At Scranton all defendants met and Leonard arranged with the Shickshinny Bank, by 'phone, to make a deposit. They break up into two groups, Alpert, Williams and Leonard leaving for Shickshinny to deposit the $14,000 check and Blumenthal driving Spillman, Brenner and Peck to Wilkes-Barre, arriving at Fuerth's Cafe. After depositing the check in the Shickshinny Bank, Alpert, Williams and Leonard met the rest of the defendants at the Fuerth's Cafe and some, if not all, had lunch; then five of the group leave Leonard and Peck in the cafe. Peck says he was waiting for Blumenthal's return to take him to Harvey's Lake. Blumenthal stated that he was waiting at Kingston to drive the group to Dallas, about halfway between Wilkes-Barre and the lake, where he desired to make a deposit. Were Peck and Leonard waiting for the return of the others to divide among the seven defendants the seven thousand dollars expected to be drawn from the Kingston Bank? ...... Their conduct from Saturday night,

September 9th, until Thursday, the 14th, when they expected to receive the spoils, clearly demonstrates that the defendants were a gang of conspirators bent on cheating and defrauding banks by forging and counterfeiting checks.''

There is a remote possibility that Peck's meetings with the other defendants and his participation in their activities, not immediately connected with the passing of the checks, were for no evil purpose, but it is a strain upon one's credulity to believe that all these various occurrences merely arose from Peck's social contact with these other defendants.

In a recent case of Commonwealth v. Mamulo, 313 Pa. 214, a similar situation was presented. Hadok shot the cashier of a trust company, fled from the bank, clambered upon the running board of an automobile which started up immediately after Hadok reached it, Mamulo being the driver of the automobile, and after the robber and the driver separated, Mamulo inquired where the robber had gone. Fourteen months after they were in each other's company in another city, at which time defendant gave a false name. It was held by the Supreme Court, speaking through Justice MAXEY, that these circumstances, although there was no direct proof, afforded legitimate inference from which the connection of Mamulo with the crime could be found by the jury. ''The conclusions and tests of every day experience must control the standards of legal logic.'' Wigmore (2d ed.), volume 1, section 27, page 232, cited by Judge MAXEY in the above case.

The judgment is affirmed and the record remitted to the court below and it is ordered that the defendant appear in the court below at such time as he may be there called and that he be by that court committed until he has complied with the sentence, or any part of it which had not been performed at the time the appeal in this case was made a supersedeas.