Commonwealth *v.* Petro, Appellant.

Argued October 29, 1934.

Before TREXLER, P. J., KELLER, CUNNING-HAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*John McClintock, Jr.,* and *Edward B. Duffy,* for appellant.

*Frederick B. Smillie,* Assistant District Attorney, and with him *Stewart Nase,* District Attorney, for appellee.

Opinion by Keller, J., December 18, 1934:

On the afternoon of Friday, January 26, 1934, at 4:08 o'clock, four men armed with revolvers and sawed off shotguns entered the mill or plant of the Acme Coppersmithing & Machine Company, at Oreland, Pa. Two of them stayed at the door, and two went into the inner office of the company where one of them pointed a gun and compelled the clerks, who were preparing the payroll, and putting the money, (about $2,400), into envelopes for distribution, to pour the money into a bag, which they took away, after tearing the telephone from the wall. All four of them left the building and went a little distance away where an automobile, driven by a fifth member of the gang, was awaiting them, and drove away.

Horace Bowers, John Esposito and John Petro were separately arrested in connection with the crime. When they were first confronted with each other Bowers called Petro a 'crook,' a 'rat' and a 'squealer,' but Petro persisted in denying that he knew Bowers. They were tried together on indictments charging, (1) robbery, while armed with an offensive weapon, and (2) felonious entry with intent to rob. During the course of the trial, after two of the Commonwealth's witnesses had identified Bowers as one of the men who had entered the office and pointed a sawed off shotgun at them, and taken the payroll money, he changed his plea from 'not guilty' to 'guilty,' and subsequently testified as a witness for the Commonwealth; but it was evident from his testimony that he was trying, in his evidence, to do as little damage as possible to the other two defendants. At the conclusion of the Commonwealth's case, Esposito pleaded guilty, and the

case was submitted to the jury only as respects the guilt or innocence of Petro. Petro offered no evidence. The jury returned a verdict of guilty on both indictments. Concurrent sentences were imposed. He has taken but one appeal from the two judgments. Rather than quash it, (Com. v. Falls, 102 Pa. Superior Ct. 392, 156 A. 894), we shall consider it as if taken from the longer sentence, that imposed on the indictment for robbery, No. 60 February Term, 1934.

Appellant contends, as his main ground for reversing the judgment, that the evidence was not sufficient to support a conviction. The evidence on behalf of the Commonwealth tended to prove that Petro had been an employee of the Acme Coppersmithing & Machine Co. for eleven weeks, but had been laid off on December 26, 1933; that for three Fridays immediately preceding January 26, 1934 he had gone to the mill about the time the payroll was being prepared. It was the custom of the Acme Company to bring the payroll money to the office every Friday afternoon at 3:30 o'clock. At the suggestion of one Peter Raffles, and with the intent of robbing the place in mind, Bowers had gone to Petro a week or ten days prior to the robbery and told him that Raffles wanted him (Bowers) to "look the mill over," to which Petro replied, "Well, I will drive you up there;" Petro drove Bowers to a point about 150 yards from the Acme Company's mill and then let him out of the automobile, promising to wait for him until he got back. Bowers had no business at the mill except to look over the place with the robbery in view. On Friday, January 26th, between 1:30 and 2:00 o'clock in the afternoon, Bowers went to Raffles' home in Philadelphia where he met Raffles, Esposito, Joseph Bruno and Ralph Romano; they went in Raffles' car to the home of one Dominic Duva, Raffles' brother-in-law, at Edge Hill, where they borrowed the latter's car, a Plymouth Sedan bearing

license plate B3351, telling him they wanted it to go to see some friends. They drove in Duva's car to Petro's house, arriving there about 3:15 o'clock. Petro was present in the house while they were talking things over and waiting until it was time to commit the robbery, but Bowers testified that he said nothing. About 4:00 o'clock Raffles, Bowers, Esposito, Bruno and Romano drove to a point near where Petro had driven Bowers on their journey to the Acme Company's mill, where they all got out except Raffles, who was driving the car. Three of the four were armed with revolvers or sawed off shotguns. Bowers and Romano went inside the building, and took the payroll money from the clerks, as before described, and then left and joined Bruno and Esposito, who were waiting at the door; then all went to the parked car where Raffles was waiting, got in and drove to Petro's house where they went upstairs and divided the money, each getting about $400. On cross-examination Bowers said that Petro stayed downstairs and got none of the money; he (Bowers) got $400; Raffles and Romano each got the same; Esposito and Bruno got some, but Bowers did not know just how much; and that "Raffles said he would take care of Petro. I do not know whether he gave him any money or not." For some reason, not set forth in the notes of testimony, the court struck out this testimony. See Com. v. Spardute, 278 Pa. 37, 49, 122 A. 161. Bowers also testified that it had been arranged between Raffles and him before the robbery that Raffles would give Petro something out of the proceeds. The Commonwealth, however, was not obliged to prove actual receipt by Petro of any of the stolen money.

Raffles, Bruno and Romano had escaped capture up to the time of the trial.

The evidence, as respects Petro, was largely circumstantial. See Com. v. Appel, 115 Sup. 496, 176 A. 44.

From the fact that Bowers had told Petro of Raffles' suggestion that he should look over the mill and Petro's offer to drive him there, together with the fact that all five of the gang drove to Petro's house and waited there discussing the plan until it was time to commit the robbery, and that immediately after the robbery they drove back to Petro's house and divided the money there, each one receiving *about one-sixth* of the stolen loot, as well as from other evidence in the case which it is not necessary to refer to in detail, the jury would be justified in drawing the inference that, while Petro was not actually present at the robbery on January 26th, he was concerned in it and had aided and abetted in its commission; and hence could be indicted, tried and convicted as a principal: Act of March 31, 1860, P. L. 427, Sec. 44; Act of June 3, 1893, P. L. 286; Com. v. Hollister, 157 Pa. 13, 27 A. 386; Brandt & Hummel v. Com., 94 Pa. 290, 301; Campbell v. Com., 84 Pa. 187, 194. The evidence in the case connecting Petro with the robbery is stronger than the proof in the cases of Com. v. Peck, 112 Pa. Superior Ct. 529, 172 A. 410, and Com. v. Habecker, 113 Pa. Superior Ct. 335, 173 A. 831, where the evidence was largely circumstantial and in both of which we upheld a conviction. See also: Com. v. Buti, 113 Pa. Superior Ct. 385, 173 A. 890; Com. v. Pulemena, 113 Pa. Superior Ct. 430, 173 A. 462; Com. v. Perdikakis, 113 Pa. Superior Ct. 320, 173 A. 472; Com. v. Skwortzo, 113 Pa. Superior Ct. 345, 173 A. 480.

In Com. v. Mamulo, 313 Pa. 214, 169 A. 109, where the contention of the Commonwealth was that the defendant was an accomplice of the robber who entered a bank and shot the cashier, there was evidence that the robber-murderer fled from the bank and jumped onto the running board of an automobile which started up immediately after the robber reached it; and also evidence identifying the defendant as the driver of the

automobile; and that fourteen months after the homicide the robber-murderer and the defendant were arrested in company, in another city, at which time defendant gave a false name. The defendant alleged that he had just happened to be in the vicinity of the bank and had been forced by the robber to drive him. The Supreme Court, in affirming a conviction of voluntary manslaughter, said, speaking through Mr. Justice MAXEY: ''Mamulo's statement to Simpson (in reply to Simpson's inquiry) to the effect that the fugitive had pulled a gun on him and made him drive the car is in itself inherently improbable ...... The inference is legitimate from the evidence in the case that Hadok, the robber-murderer, had an accomplice and that this accomplice was waiting for him, and that he got into the accomplice's car, and finding himself pursued he alighted from that car and shortly afterward commandeered another car in which to get out of town. The defendant's identity as the driver of the waiting Essex car was sufficiently explicit to carry the question of the identity to the jury. The Commonwealth showed the defendant in apparent criminal privity with the murderer very shortly after the homicide, and also showed the defendant and Hadok in close association at the time of their arrest, when they were many miles from the Ohio city which they claimed was their home. The evidence as to the defendant's criminal connection with Hadok at the time of the homicide, if credited by the jury, cannot be dismissed as unsubstantial, or as evidence sufficient to support merely a conjecture as to the defendant's guilt. This evidence and the legitimate inferences from it amounted to substantial evidence tending to sustain the indictment, and its submission to the jury was justified. The conclusions and tests of everyday experience would lead a reasonable person to believe after accepting Simpson's identity [identification?] of

the defendant (and the question of identity was for the jury) that the defendant was waiting in his car at an appointed place for Hadok to return from the bank with the fruits of his robbery and to help Hadok make his escape. 'The conclusions and tests of everyday experience must control the standards of legal logic' (Wigmore (2d Ed.), volume 1, section 27, page 232), and these standards were not departed from when the case was submitted to the jury.''

So in this case, the Commonwealth showed the defendant in apparent criminal privity with the robbers immediately before and immediately after the robbery. It linked him up with the robbers in their preliminary ''look over'' the place to be robbed. Taken in connection with his denial, when arrested, that he knew Bowers, it is sufficient to lead a reasonable person to believe that he was concerned in the robbery and aided and assisted in its execution, and participated in the booty. Judged by the conclusions and tests of everyday experience, the evidence in the case was such that the jury might readily find that it was consistent with the defendant's guilt and inconsistent with his innocence. The court below did not err, in our opinion, in submitting the case to the jury.

The court cautioned the jury, with particularity, as to their duty to scrutinize carefully the evidence of Bowers, who was a confessed felon, and no exception has been taken by the appellant on that score.

The only other assignment of error relates to the admission in evidence of the testimony of one William Dwyer, an employee of the Acme Company. The district attorney, for the purpose of showing defendant's attempt to intimidate witnesses for the Commonwealth, who might be called to testify against him— (which was entirely proper for him to do; for the Commonwealth may show an attempt by the defendant to intimidate its witnesses: Cover v. Com., 5 Sadler 79,

8 A. 196; Com. v. Marion, 232 Pa. 413, 423, 81 A. 423; Heslop v. Heslop, 82 Pa. 537, 541; 16 Corpus Juris Sec. 1075, pp. 555-6; Wharton's Criminal Evidence, Sec. 750, p. 644, 9th Ed.; just as it may offer proof of his fabrication of evidence: Com. v. Spardute, 278 Pa. 37, 43, 122 A. 161; Com. v. Jones, 297 Pa. 326, 333, 146 A. 905),—asked Dwyer what if anything Petro had said to him in March of this year, to which he answered that Petro said "He would get square with me and Collins," [the foreman of the mill], but he then added "I did not take it seriously ...... I asked him what that was all about, and he said he was just kidding." But he later admitted that he had told the district attorney on March 26th that Petro said to him (Dwyer) that he would get him for testifying in this case, "and that goes for Collins, too," but added "what he meant I don't know."

The district attorney was justified in asking the question, and the fact that the witness, whether from fear or some other motive, tried to neutralize what he had previously told the Commonwealth's officer, did not make it reversible error.

The assignments of error are overruled. The judgment is affirmed and it is ordered that the defendant appear in the court below at such time as he may be there called and that he be by that court committed until he has complied with the sentence or any part of it which had not been performed at the time the appeal in this case was made a supersedeas.