## Commonwealth v. Sauders, Appellant.

380

Argued April 15, 1957. Before Jones, C. J., Bell, Chidsey, Musmanno, Arnold, Jones and Cohen, JJ.

*Jacques H. Geisenberger*, with him *Theodore L. Brubaker*, for appellant.

*William C. Storb*, District Attorney, for appellee.

Opinion by Mr. Justice Bell, October 7, 1957:

The defendant, Mary E. Sauders, alias Mary E. Sauder, was indicted for the murder of William (Will) Glasgow, and was convicted by a jury of murder in the first degree with the recommendation of life imprisonment. Motions in arrest of judgment and for a new trial were filed by counsel for the defendant. The motion for a new trial was not pressed at the time of argument in the Court below; nevertheless the motion

in arrest of judgment and the motion for a new trial were dismissed by the lower Court.

The very important question raised in this case is whether the evidence, which was solely circumstantial in character, was legally sufficient to support the defendant's conviction of first degree murder.

On *May 3*, 1955, the date of the murder, and for a considerable period of time prior thereto, the defendant and William Glasgow, the victim, lived together, admittedly without benefit of clergy. The evidence produced by the Commonwealth clearly established that William Glasgow was murdered by being struck over the head with some blunt instrument as he lay in his bed in the very small one room house occupied by the victim and the defendant. The murder weapon was never found. Dr. O'Donnell testified that any normal adult, male or female, could have inflicted the fatal wounds if the murder weapon was heavy enough.

There was no eye witness of the murder and the exact time of death was unknown. According to the Commonwealth's evidence, the defendant was the last person known to have seen Glasgow alive. At 8 p.m. on the evening of *May 3*, 1955, a neighbor, Thomas Hardin, informed Glasgow that the defendant was called on Hardin's telephone. Between 9:30 and 10:00 p.m. of that same evening, defendant left the house where she and the deceased lived. She then entered a taxicab which she had ordered and which had been parked in front of the residence. The taxi was driven by James T. Browning (called "Brownie" by the defendant). There was no evidence of any one else having seen the decedent until 2:00 p.m. the following day when he was found murdered by Hardin. Dr. Stahr, the Deputy Coroner, testified that in his opinion the death occurred somewhere between 8 and 20 hours before the body was discovered.

Upon discovery of the murder, Hardin called the police. Upon arrival, the police found the victim's body lying in a pool of blood on his (and defendant's) bed. Clothing hanging on pegs near the bed and other objects near the bed were spattered with blood. The foot end of the bed and the ceiling of the room were similarly spattered with blood. According to State Policeman Charles Simmons (the investigator), the room in which he found the decedent was not disorderly and did not show any evidence of a struggle. He also found a pocketbook under the pillow on which decedent was lying. It contained a $100 bill and a $5 bill. Simmons was the first to interview the defendant on the evening of May 4, 1955, at which time the defendant was taken into custody. He testified, inter alia, as follows:

". . . one of the first things she asked me she said, 'Did you find Will's pocket book, he had a $100.00 bill in it and a $5.00 bill in it.' I said now where could it have been, and she said it was in his pocket book under his pillow, then I asked her several different questions, and then she turned to Brownie and said, 'Don't you remember my calling back and telling Will to put the cat in, didn't you hear him answer me?', and Brownie said 'No'. Mrs. Sauders was fairly well intoxicated as she sat there, and we took her into custody at that time. . . .

"(Q) Did you question her at a later date? (A) I questioned Mrs. Sauders a number of times. (Q) What, if anything, did she tell you happened? (A) Well, the money angle was one of the first things she talked about, and when questioned how she came about this money, she said Will had given her $238.00 to buy a monument for her son who had died, and that she had $5.00 of her own. Later when she figured out what she had spent of the money, she had spent the ma-

jority, and what we recovered, was approximately $438.00 which is about $200.00 in excess of the amount she admitted he gave her. (Q) What did she say about that? (A) She was confused, and said she didn't know what he gave her, she always had this answer."

The Commonwealth proved that the clothing hanging near the body as well as a great number of other objects situated near the bed were spattered with a pattern of blood droplets. The most incriminating evidence, as far as the defendant is concerned, was that *bloodstains* were found on the dress and coat which she was wearing when she left the residence on the evening of May 3, 1955. Peter Strickler, an expert chemist, testified that the dress and coat worn by the defendant contained the same pattern of blood droplets as were found on other clothing in the vicinity of the victim, and that this blood was human blood. *The defendant admitted that the bloodstains found on the front left shoulder area of her dress and on the lower portion of the right sleeve and on the left front chest area of her coat were the blood of William Glasgow, the victim.*

Defendant gave conflicting stories concerning how the bloodstains had gotten on her clothes. First, she told Officer Simmons that the bloodstains on her dress were received when she accompanied Glasgow to a doctor's office after Glasgow was involved in an automobile accident. When subsequently confronted with the falsity of her story of accompanying Glasgow to a doctor after an automobile accident which occurred several months prior to the murder, she then said that a man by the name of George Streeter had come to the house on the evening of *May 3*, 1955, and had struck Glasgow in the face thus causing his nose to bleed and the blood spattered on her dress and coat. Defendant did not produce the George Streeter whom she impli-

cated and could not identify a man named Streeter who was produced by the State Police. An exhaustive search by the State Police failed to disclose any other George Streeter such as described by the defendant. Officer Simmons further testified that the defendant stated at one time that she would take the entire blame for the crime because she hated to see "Brownie [James T. Browning, the taxicab driver] burn . . . he is too young to die."

The Hiltons and the Hardins lived in the (same) house which adjoins that of the victim. Thomas Hardin testified that after 10:00 p.m. on the evening of May 3, 1955, he failed to see anyone around the Glasgow or Sauder residence, and likewise failed to hear any noise therein. He reiterated this testimony with regard to two periods during the early morning hours of May 4 when he arose to feed his newly born baby. Ruth Ann Hilton, age 12, recalled seeing the arrival of the taxicab driven by Browning, and stated that she did not see anyone else around the victim's residence that evening. Elizabeth Hilton testified that she did not hear or see any disturbance around the premises that night, and that her dog, who generally barked quite loudly when strangers approached, failed to bark on that evening. Leroy Hilton, the husband of Elizabeth Hilton, corroborated this testimony insofar as the dog was concerned.

Defendant consistently denied her guilt. According to her testimony on direct examination, she last saw William Glasgow when leaving their room on *May 3* to take the (Browning) taxicab (between 9:30 and 10:00 p.m.). Glasgow had been lying in bed, so defendant testified, before Streeter's arrival. Defendant testified, inter alia, as follows:

"A. When George [Streeter] came in I was ready to go to town, and he said, 'Are you going away'? I

said yes. Will [Glasgow] spoke up and said 'Will you take somebody like that along with you?' I said no, I didn't know if I was even going, and Will made remarks about him and said if I was going with somebody like that just give him back the money and we will go again, and he and George had an argument and George slapped him on the face and Will got up and sat on the front of the bed, and I got up and I took hold of Will and I told him to sit down. George had brought two bottles of beer along with him to make certain he had something in the house to drink. I said you take your beer and get moving and I walked Will over and he sat down on the bed again, and after that there I got the telephone call. . . .

"Q. And you say George Streeter struck him? A. Yes, struck him right around the mouth across the nose. Q. Did that cause anything? A. Causing the nose to bleed. Q. What did you do after that? A. Well Will and he got up, his nose was bleeding, he bleeds very easily, and that's how I got the blood on my shoulder. I said, 'Now Will, sit down'. He crossed over and got the beer and he was standing pretty close, and I told him to get going and I said you don't need to bother coming back anymore, just like that. . . .

"Q. After George slapped Will on his nose and his nose started to bleed, what happened then, what did you do? A. I told George to get going. Q. And did he? A. Yes, he went, yes. . . .

"Q. This was going on while you were taking care of Will's nosebleed? A. Yes. Q. You left him take off? A. George left right away and I finished cleaning Will up. Q. Then you say you had this blood splashed over your dress? A. I knew the blood was there, Will told me to go and change my dress. Q. Who told you?

A. He did, he told me to change, but I said I would just keep this on it didn't hurt anything."

Defendant then testified that Glasgow had asked her to turn off the television receiver since he was "going to lie down and go to sleep". At this time Glasgow had on his pajamas with a pair of pants pulled over top of them. She then left their home between 9:30 and 10:00 p.m. and got in the (Browning) taxicab. Defendant then related a night and day of carousing in various bars and cafes in the City and County of Lancaster, having been driven there by Browning who corroborated her testimony in this respect. During the course of this carousing, defendant spent a considerable sum of money, admittedly the money of the victim. She testified that she spent part of the money for a new dress. On a later occasion, when asked about this dress by Officer Simmons, defendant replied (according to Officer Simmons): "I knew Will was dead and I wanted to go to the funeral home." The evidence shows that the defendant was not apprised of the death of Glasgow by outside sources until *after* she had purchased the dress.

In her oral statements to the police immediately after being taken into custody and in a *written statement* which she made, defendant related in great detail her activities on the day preceding the murder, the night of May 3, 1955, and the following day. It is significant that in these initial oral and written statements, the *defendant failed to mention George Streeter in any way whatsoever*. It was only after the defendant was confronted with the pattern of blood spatters on her dress and coat, that the name of George Streeter was mentioned. On cross-examination, the defendant was confronted with the written statement which, incidentally, was at variance with several statements that she had made on direct examination. The defend-

ant was asked why she did not mention George Streeter at the time the written statement was executed. Defendant answered that she was afraid "that George would do something to me". Upon further questioning in this matter, defendant was again asked why she did not tell them about George Streeter in the statement. She replied "Well, I figured they could find it out for themselves, that's what they are for."

From the time of her arrest throughout the course of the trial, defendant, we repeat, has staunchly maintained her innocence and denied having committed the murder or having any knowledge concerning it.

Was the evidence sufficient in law to justify a verdict of first degree murder?

A jury can believe all or a part of or none of a defendant's testimony or of the testimony of any witness for the Commonwealth or for the defense: *Commonwealth v. Kloiber*, 378 Pa. 412, 422, 106 A. 2d 820; *Commonwealth v. Donough*, 377 Pa. 46, 50, 103 A. 2d 694; *Commonwealth v. Homeyer*, 373 Pa. 150, 94 A. 2d 743.

In *Commonwealth v. Bolish*, 381 Pa. 500, 113 A. 2d 464, the Court said (page 508) : ". . . Proof by eye witnesses or direct evidence of the corpus delicti or of identity or of the commission by the defendant of the crime charged is not necessary. '. . . It is clearly settled that a man may be convicted on circumstantial evidence alone, and a criminal intent may be inferred by the jury from facts and circumstances which are of such a nature as to prove defendant's guilt beyond a reasonable doubt: Commonwealth v. Kloiber, 378 Pa. 412, 106 A. 2d 820; Commonwealth v. Homeyer, 373 Pa. 150, 94 A. 2d 743; Commonwealth v. Lowry, 374 Pa. 594, 600, 98 A. 2d 733; Commonwealth v. Danz, 211 Pa. 507, 60 A. 1070; Commonwealth v. Wentzel,

360 Pa. 137, 61 A. 2d 309': Commonwealth ex rel. Garrison v. Burke, 378 Pa. 344, 348, 106 A. 2d 587."

In *Commonwealth v. Nasuti*, 385 Pa. 436, 123 A. 2d 435, the Court said (page 445) : ". . . All that is required is that, the evidence being circumstantial, the circumstances proved should be such as reasonably and naturally to justify an inference of the guilt of the accused, and of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt: Commonwealth v. Marino, 142 Pa. Superior Ct. 327, 334, 16 A. 2d 314, 317; Commonwealth v. Bausewine, 354 Pa. 35, 41, 46 A. 2d 491, 493; Commonwealth v. Carey, 368 Pa. 157, 163, 164, 82 A. 2d 240, 242; Commonwealth v. Kloiber, 378 Pa. 412, 427, 106 A. 2d 820, 828."

In *Commonwealth v. Donough*, 377 Pa., supra, the Court said (page 51) : "A variety of definitions of 'reasonable doubt', all expressing substantially the same thought, have been approved by the appellate Courts— see Commonwealth v. Kluska, 333 Pa. 65, 3 A. 2d 398. A standard and approved form of charge on this point would be: 'The defendant comes before you presumed to be innocent and the burden is upon the Commonwealth to prove his guilt beyond a reasonable doubt. A reasonable doubt cannot be a doubt fancied or conjured up in the minds of the jury to escape an unpleasant verdict; it must be an honest doubt arising out of the evidence itself, the kind of doubt that would restrain a reasonable man (or woman) from acting in a matter of importance to himself (or herself).' "

In *Commonwealth v. Bolish*, 381 Pa., supra, the Court said (page 524) : ". . . false or contradictory statements by the accused are admissible since the jury may infer therefrom that they were made with an intent to divert suspicion or to mislead the police or other authorities, or to establish an alibi or innocence,

and hence are indicatory of guilt: *Commonwealth v. Lowry*, 374 Pa. 594, 601, 98 A. 2d 733 . . ." See to the same effect: *Commonwealth v. Homeyer*, 373 Pa., supra; *Commonwealth v. Spardute*, 278 Pa. 37, 122 A. 161; *Commonwealth v. Danarowicz*, 294 Pa. 190, 144 A. 127; *Commonwealth v. Hadok*, 313 Pa. 110, 169 A. 111; *Commonwealth v. Karmendi*, 328 Pa. 321, 328, 195 A. 62; *Commonwealth v. Jones*, 341 Pa. 541, 19 A. 2d 389; *Commonwealth v. Lettrich*, 346 Pa. 497, 31 A. 2d 155; *Cathcart v. Commonwealth*, 37 Pa. 108, 113; *McMeen v. Commonwealth*, 114 Pa. 300, 306, 9 A. 878; *Commonwealth v. Johnson*, 162 Pa. 63, 29 A. 280; *Commonwealth v. Jones*, 297 Pa. 326, 146 A. 905.

We have reviewed the evidence and the law as we are required to do by the Act of February 15, 1870* "in order to determine whether the ingredients necessary to constitute murder in the first degree have been proved to exist": *Commonwealth v. Leamer*, 386 Pa. 485, 126 A. 2d 409; *Commonwealth v. Thompson*, 381 Pa. 299, 113 A. 2d 274; *Commonwealth v. Bibalo*, 375 Pa. 257, 100 A. 2d 45. Reviewing and analyzing the evidence in the light of the above mentioned authorities, the evidence is sufficient in law to justify the jury's verdict of guilty of murder in the first degree.

Judgment and sentence affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On May 4, 1955, at an address known as Willow St., R. D. No. 1 in Lancaster County, the dead and severely beaten body of Will Glasgow was found in a small one-room house in which he had lived (intermittently) with Mrs. Mary E. Sauders for some twenty

---

* P. L. 15, §2, 19 PS §1187.

years without marriage ties, ritual, or obligation. No witness came forth to describe how Glasgow was killed but the condition of the body, as described professionally, gave indisputable proof of a violent death caused by the use of a blunt instrument which had descended many times on its human target.

Several hours after the discovery of the body, Mrs. Sauders was taken into custody by the State Police and charged with murder. She was indicted, tried, and convicted of murder in the first degree, and sentenced to life imprisonment. She has appealed to this Court contending that the evidence presented by the Commonwealth did not measure up to the standard required by law for conviction and that, therefore, she should be discharged from custody.

It is admitted by the Commonwealth that the evidence against Mrs. Sauders is entirely circumstantial but it argues, and properly so, that circumstantial evidence may be enough to sustain a conviction of any crime including murder in the first degree. The only question in this case is whether the circumstances actually satisfy the mind beyond a reasonable doubt that Mrs. Sauders killed Will Glasgow.

From the record one is justified in concluding that the Commonwealth proved that Mrs. Sauders and Glasgow lived together in a house next door to one owned by Leroy Hilton; that at about 8 p.m., on May 3rd, Thos. Harden, Hilton's son-in-law, went to Glasgow's house to tell Mrs. Sauders that she was wanted on the telephone in the Hilton house; that Harden saw Glasgow at the time and he was alive; that on the following day at 2 p.m., he went again to the Glasgow house and found Glasgow dead; that at about 9:30 p.m., on May 3rd, the previous night, Mrs. Sauders had left the Glasgow house in a taxicab driven by James T. Browning who, under her direction and instructions, took her

to numerous bars and cafes in Lancaster where she consumed considerable quantities of alcoholic beverages; that she displayed on one occasion three $100 bills and a $50 bill; that she paid for the expensive taxi hire and gave Browning money to buy drinks; that at 4:30 in the morning he left her at an address on South Water Street; that several hours later he called for her and drove her around town; that she bought and changed into a new dress; that she went to a cemetery memorial dealer and there purchased for $115 a tombstone to be placed over the grave of her son; that sometime during the day she said that "Will [Glasgow] had hemorrhaged but I don't think he committed suicide"; that she went to Groff's Funeral Home to which Glasgow's body had been taken and while there was arrested by the State Police. A chemist, member of the State Police, testified that some stains and spots on Mrs. Sauders' dress and coat were dried human blood. When questioned about these spots, Mrs. Sauders told two different stories: one, that her dress had been spotted from injuries sustained by Glasgow in an automobile accident and, two, that her dress had been stained as a result of a severe nosebleed which Glasgow suffered when a George Streeter had struck Glasgow with his fist. When questioned about the money she had in her possession, Mrs. Sauders said that Glasgow had given her $238 to buy a grave marker for her son. While being questioned on the subject of money she asked the police if they had not found $105 in Glasgow's pocketbook. That amount was in fact found in a wallet under the pillow in Glasgow's bed.

The Commonwealth contends that the evidence proves that Mrs. Sauders killed Glasgow and that she did so in order to obtain his money. If larceny or robbery was the object of the homicide, why did she not

also take the $105? Or did she shrewdly leave that amount in order to rebut a possible accusation of a robbery-murder?

There are unquestionably many circumstances in this case which point toward Mrs. Sauders as the murderer of Will Glasgow. These circumstances fall about her like a heavy and violent rain which envelopes a house in the country. One can see the structure through the curtain of mist and sheets of water but one cannot say with precision whether the building is two or four stories high, whether it is constructed of brick, stone, or wood, what its color may be, and whether it is inhabited or not. All one can say is that it is a house—presumably. The money found on the defendant, the spots on her dress, and the conflicting stories about the spots all envelop the defendant in a mist and fog of supposed guilt, but not one piece of evidence, or all taken together, cause her to stand out clearly and distinctly as the person who felled Glasgow in a foul and bloody murder.

Mrs. Sauders' story that Glasgow gave her money to buy a tombstone is confirmed in the fact that she actually did purchase a tombstone. Her statement to the cab driver Browning that she did not believe Glasgow had committed suicide was prompted, she explained, by the news received from the funeral director that Glasgow was dead.

The Commonwealth maintains in its brief that: "It is almost too clear for argument that the only way this blood could have spattered on the defendant's dress and coat was for the defendant to have been present at the time that the victim was murdered." It will be recalled that Mrs. Sauders gave two explanations as to how the blood spots had appeared on her dress: (1) that Glasgow had been in an automobile accident and (2) that Glasgow had suffered .a severe

nosebleed. But neither of these admissions (contradictory to each other) would prove that she was present when Glasgow was killed.* Glasgow could have been murdered by someone else, with or without Mrs. Sauders' knowledge, and some of his blood attach to her dress without her being present at the time of the killing. Since the pictures and descriptions of the body and bed reveal that Glasgow lost large quantities of blood, it is impossible to assume that Mrs. Sauder could have wielded an instrument which broke the dike of Glasgow's life fluid and then have emerged from the gory flood with only a slight spattering of droplets on her clothing. The house in which Glasgow and Sauders lived was not much better than a shack and it had no running water facilities. The State Police investigation uncovered no evidence that garments had been washed in the severely limited time within which such laundering could have been accomplished, namely, between 8 p.m., when Glasgow was seen by Hardin alive and 9:30 when Mrs. Sauders left the habitation. It is to be observed further that the spattering of blood droplets on Mrs. Sauders' dress was so inconspicuous that though she wore the dress the entire evening and night as she proceeded from one drinking place to another no witness was produced to say he had observed anything suspicious about her clothing. Even Browning, the cab driver, noticed no blood spots on her garments although he did say that after they had been in numerous taverns and cafes, at one of which places Mrs. Sauders drank six to eight glasses of beer, she made the remark that her dress had been soiled by beer and for that reason she wished

---

* It was not shown nor was any attempt made to show that the blood spots on Mrs. Sauders' dress were of the same type as Glasgow's blood.

to change it. But this occurred at least 15 hours after she had left Glasgow's house.

Finally, on the subject of blood, the chemist could not estimate the age of the spots on the dress, which allows for the possibility that the spots had attached innocuously to the dress a long time before Glasgow's death. While the hypothesis that Mrs. Sauders murdered Glasgow is not to be excluded, the law should not permit her conviction to stand on the basis of the bare possibility she might have killed Glasgow. If possibility and accessibility are to be the criteria for establishing guilt, then all the people living in the neighborhood of the Glasgow house could be and would be suspect. Between the time that Glasgow was last seen alive by Harden and the time he was discovered dead, 18 hours expired, certainly a long enough time for the murder to have been committed without Mrs. Sauders' participation or knowledge.

On the basis of guilt, considering the evidence which was presented in Court, Mrs. Sauders, in order to commit the crime, would have had to do the following between 8 and 9:30 p.m., May 3rd. At 8 p.m. she would have had to leave the Glasgow house and proceed to the Hilton house to answer a telephone call; return to the Glasgow house and there wield a blunt instrument at least ten times on the head and body of Glasgow; do away with the blunt instrument; cleanse herself of the resulting blood; wash, hide, or destroy bloody garments; go again to the Hilton house at 8:30 or 8:45 to telephone the taxicab company for a cab; and return to the Glasgow house to prepare for her night of carousal. If she did not kill Glasgow prior to visiting the Hilton house for the second telephone call at 8:30-8:45, then she had to accomplish the killing, washing, concealing and all the other gory details between 8:45 and 9:30, and do all this so ef-

ficiently that the State Police with all their most skilled and modern methods of detecting, investigating, searching, and scrutinizing, were unable to discover any article or item in the house which would definitely connect Mrs. Sauders with the killing. This does not sound reasonable; it does not sound credible.

While the Commonwealth is not required to establish motive for a murder if it can actually show that the defendant did kill the victim wilfully, deliberately, and with malice aforethought, it cannot be assumed, where the circumstances are capable of many interpretations, that robbery would be enough motive for a woman, who had not theretofore given any evidence of homicidal tendencies, to accomplish a violent killing of her benefactor and friend for $400 or $500. Although the amount of money in Mrs. Sauders' possession at the time of her arrest was considerable for one in her apparent station of life, it seems that she was given to spending freely even before the fatal night of May 3-4, 1955. Browning testified that on the previous Friday or Saturday night she had run up a taxi bill of $17.

There is no evidence that Mrs. Sauders and Glasgow had quarreled the night of the killing, there is no testimony that she had ever behaved violently toward him on previous occasions, there is no suggestion that there existed between them a hostility which could have urged her into a vengeful act of violent reprisal against him.

The conflicting stories which Mrs. Sauders told about the origin of the blood spots on her dress, neither one of which she corroborated with fact, are definitely evidence against her credibility. While the Commonwealth is not required to attempt to reconcile contradictions in an accused's story of exculpation, it is nevertheless to be noted that Mrs. Sauders' almost

continuous drinking from about 10 p.m. on May 3rd until about 4 p.m., the following day (with the exception of some 4 or 5 hours given to sleep) could not have contributed to a clear head for thinking and remembering. Moreover, a short time after making the contradictory statements she had to be taken to the hospital for an emergency appendicitis operation. Thus, her confusing utterances, suspicion-provoking as they are, can not rise to a very high degree of self-incrimination without some positive supporting circumstance that neither story is worthy of belief.

An indication of the irresponsible tongue which formed her utterances can be gained from the fact that at one point in her interrogation Mrs. Sauders said that she would assume the entire blame for the killing because she hated to see "Brownie [the taxicab driver] burn . . . he is too young to die." No one accused Brownie [James T. Browning] of the murder and there was not the slightest intimation on the part of anyone that Browning could have been implicated in the murder in any way.

However, apart from all this, a conviction of murder cannot be based on improbable stories told by the accused. A man standing unarmed by the body of a freshly stabbed or shot person can say that an eagle swooped down and strangled the victim at his feet, and still not be amenable to criminal prosecution on that obviously fabricated story.

Regretful as the law must be that a murder may (at least for the moment) go unpunished, disappointed as society might even feel that a person intimately associated with the victim and the events surrounding his death, should escape condemnation, no system of jurisprudence worthy of the name could or should allow a conviction to stand when legal proof is missing, corroborating circumstances are lacking, and suspicious

particulars remain in the realm of speculation, guess, and surmise.

When circumstantial evidence alone is depended upon for conviction, it must be of such a character that it points unequivocally in one direction alone. A roadsign at cross-highways which points in two opposite directions for the same geographical destination is valueless. Evidence which levels accusing fingers at several people when only one person can be guilty is as worthless as a weather vane in a hurricane. Circumstantial evidence can be the very best of evidence to establish an accurate and trustworthy conclusion when, like a bridge crossing a wide stream, it rests on solid piers which cannot be washed away by the slightest current of inquiry, will not crumble under hammer blows of testing, and will not fall apart because of inherent weakness in the building material. On what kind of piers does the bridge of conviction in this case rest?

Motive? The Commonwealth says it was robbery. When the hammer begins to test, we find that as a robber Mrs. Sauders did not take all the money which was available to her hand. We find further that her story that Glasgow gave her money to buy a tombstone for her son was corroborated in fact. And we find further that she spent large sums of money for taxicab fares even before the killing.

Accessibility to commit the crime? This pier is the weakest of all. Although neighbors testified they heard no unusual noises during the night after Mrs. Sauders left Glasgow's house, neither did they hear any unusual noises when, according to the Commonwealth, Mrs. Sauders was committing the crime. There was no evidence that Glasgow was dead when Mrs. Sauders left his house, and some 18 hours were to pass before he was discovered dead, in all of which time the

murder could have been committed by someone other than Mrs. Sauders.

Evidence of instrument used in committing the murder? Nothing was found which would connect Mrs. Sauders with the assumed blunt instrument which accomplished the killing.

Mutely incriminating evidence? The fragmentary spots of blood on Mrs. Sauders' dress could have come from contact with Glasgow or his blood in many ways without the contact having been due to a murderous attack.

Not a pier remains solidly upholding the bridge of conviction. Instead of crossing over on a bridge, the theory of prosecution leaps from stones of suspicion to stones of surmise, and from stones of assumption to stones of argumentation. This is not enough to take any person to a penitentiary for life. It is not enough to sustain any conviction under our salutary system which specifically states that guilt must be established beyond a reasonable doubt. The doubts in this case are not only reasonable. They envelop the entire prosecution and conviction in clouds of uncertainty and indecision. Such a conviction cannot and should not stand.

I dissent.