Commonwealth *v.* Whiting, Appellant.

Argued November 13, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and KEIM, JJ.

*Daniel E. Beren,* for appellant.

*George C. Corson, Jr.,* Assistant District Attorney, with him *Vincent A. Cirillo,* Assistant District Attorney, and *Harold W. Spencer,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, January 8, 1963:

The defendant, Charles Edward Whiting, was convicted by a jury of murder in the first degree, and sentenced to life imprisonment. From the judgment of conviction and sentence, this appeal is prosecuted.

The first assignment of error concerns the sufficiency of the evidence to sustain the conviction, and

whether or not the defendant was entitled to have the judgment arrested after verdict. In evaluating the merit of the question, the testimony must be read in a light most favorable to the Commonwealth. *Commonwealth v. Deyell,* 399 Pa. 563, 160 A. 2d 448 (1960). On appeal, we must accept as true all of the Commonwealth's evidence upon which, if believed, the jury could have properly based its verdict, *Commonwealth v. Kravitz,* 400 Pa. 198, 161 A. 2d 861 (1960). The test of the sufficiency of the evidence, irrespective of whether it is direct or circumstantial, is whether accepting as true all of the evidence upon which, if believed, the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime charged: *Commonwealth v. Kravitz,* supra; *Commonwealth v. Hart,* 403 Pa. 652, 170 A. 2d 850 (1961).

The testimony read in this light may be briefly summarized as follows:

Juan Otero operated a tailor shop at 56 East Spring Avenue, Ardmore, Pennsylvania, and lived in a small connecting apartment to the rear thereof. Shortly after 9:15 p.m. o'clock on June 14, 1956, Mrs. Isabel Strickland, who lived in an apartment above, heard sounds of a quarrel, scuffling and screams emanating from the apartment connected with the tailor shop below. She went to her bedroom window overlooking a rear entrance leading from the tailor shop premises to an alley, and saw a colored man, whom she did not recognize, start out of the Otero apartment and then immediately re-enter. It was dark and she could not see his face. Within seconds, the same individual came out again. He was dressed in a light "T" shirt, dark trousers, light baseball cap, and carried a paper clothing bag. Immediately alerting neighbors, together with Mrs. Strickland, they hurried to the Otero premises and saw Juan Otero lying on the floor of the kitchen

in a pool of blood. No one else was on the premises. Mrs. Strickland called the police at exactly 9:28 p.m. They arrived within minutes and found the victim dead as a result of six stab wounds in his body. Otero had been seen alive by another neighbor about 9:10 p.m. o'clock, standing in front of his tailor shop.

Within minutes thereafter, Mrs. Strickland went by automobile to the home of her family, three blocks away. After a very brief stop, she started home again and en route saw a colored man of the same build and appearance as the man she saw leaving the Otero premises. He was walking along the street about a block and one-half from the scene of the killing, still wearing the same type of clothing described, but was not carrying a bag. She reported this fact to the police. At first, when she saw this individual she could not remember his name, but shortly thereafter she realized that it was the defendant, Charles Edward Whiting, and so told the police.

The appellant-defendant was taken into custody and questioned about the killing early the next morning. A search of the room where he lived revealed a white "T" shirt, dark trousers, shorts, socks, a military fatigue cap, shoes and a paper clothing bag. Blood spots and blotches of blood were readily discernible on each of the items of clothing and on the clothing bag. The defendant admitted wearing this clothing on the night before.

In midmorning of June 15th, the defendant gave a statement to the police wherein he stated that he had been in the Otero tailor shop between 7:30 and 8 o'clock p.m. the night before to pick up some clothes previously left for attention. He said that he received his clothes, departed and did not return. Subsequently, he learned about the assault upon Otero and watched from nearby as the police placed the victim's body in the ambulance.

Later on the same day, the defendant gave another statement to the police, which was substantially different than the one previously given. Therein, he said he went to the tailor shop at 7:30 p.m., paid for his clothing but decided to leave it there until he was going home. He returned to the shop about 9:30 p.m. o'clock, saw the body of the victim lying on the floor in a pool of blood. He knelt alongside the body, rolled it over, jumped up shaking the blood off his hands, grabbed his clothes and ran out of the rear entrance.

He explained his unusual actions as being due to fright and emotional disturbance based upon his recollection of a related experience while serving in the armed forces during the Korean War.

Laboratory tests disclosed that the specimens of blood found on the clothing, shoes and bag found in defendant's room were the same blood type as that of the victim and of a different type than that of the defendant.

Certainly, this evidence, when viewed in totality, is amply sufficient to warrant the conclusion of defendant's guilt beyond a reasonable doubt. The defendant argues that it constitutes only a series of suspicious circumstances, proving only that the defendant was on the scene at or about the time of the killing. It adds up to much more than that. The testimony of the witness, Strickland, places the defendant in the death room at the exact time of the killing. Other than the victim no one else was seen on or leaving the premises. The blood on the defendant's clothing is strong proof that he was there and participated in the knifing. His hurried exit and subsequent false and misleading statements to the police strongly indicate consciousness of guilt. See, *Commonwealth v. Homeyer*, 373 Pa. 150, 94 A. 2d 743 (1953); *Commonwealth v. Sauders*, 390 Pa. 379, 134 A. 2d 890 (1957); and *Commonwealth v. Kravitz*, supra.

True, the Commonwealth's case is based completely on circumstantial evidence, but "Proof by eye witnesses or direct evidence of the corpus delicti or of identity or of the commission by the defendant of the crime charged is not necessary." *Commonwealth v. Bolish*, 381 Pa. 500, 508, 113 A. 2d 464 (1955). It has been well said, that " 'Circumstantial evidence is, in the abstract, nearly, though perhaps not altogether, as strong as positive evidence; in the concrete, it may be infinitely stronger' ": *Commonwealth v. Kravitz*, supra, at page 215, repeating what was said in *Commonwealth v. Kovovic*, 209 Pa. 465, 468, 58 A. 857 (1904).

The failure to prove the existence of motive is not fatal to the Commonwealth's case, *Commonwealth v. Nasuti*, 385 Pa. 436, 123 A. 2d 435 (1956).

There is no doubt in our minds that, under the evidence, the question of defendant's guilt was for the jury.

## Trial Errors

These assignments of error concern three portions of the charge of the trial court.

At one point in the instructions to the jury, the judge said, "Your verdict must be unanimous before you can be discharged." It is urged that this was coercive and precluded the possibility of a hung jury. It is without merit.

A reading of the charge as a whole is conclusive beyond doubt that it was eminently fair and defined the issues to be resolved in clear language. The sentence complained of, taken out of context, must be considered and read as part of the whole instructions in determining its correctness and effect: *Commonwealth v. Schurtz*, 337 Pa. 405, 10 A. 2d 378 (1940), and *Commonwealth v. Butler*, 405 Pa. 36, 173 A. 2d 468 (1961). When so read, it is readily apparent that the charge

defined the jury's prerogatives with utmost caution and admonition and had no such effect as is now contended.

Finally, it is argued that the failure of the trial judge to define the crime of burglary or robbery and to explain the defense of alibi, constituted prejudicial error. It is noted that no such requests were made at trial and only a general exception to the charge recorded. Beyond that and more importantly, no such instructions were required. The issue presented to the jury for determination was whether or not the defendant was guilty of a wilful, deliberate and premeditated killing. He was not charged or tried for a murder committed in the perpetration of a felony. As to alibi, no such defense was presented. The defendant himself admitted being in close proximity to the scene at the vital time. Alibi is a defense that places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party. No such facts are in the record. There is no duty on a trial judge to charge a jury upon law which has no applicability to the presented facts. There must be some relationship between the law upon which an instruction is required and the evidence presented at the trial: *Commonwealth v. Coleman*, 402 Pa. 238, 166 A. 2d 525 (1961).

Judgment affirmed.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

This is a murder case. The defendant was tried for the most serious of all crimes. The trial could have resulted in the death penalty. The jury fixed the penalty at life imprisonment, which, while not as harsh and agonizing as death, is still a dolorous termination to the great gift of life. A reading of the record would indicate that the defendant was probably guilty. It is

thus greatly to be lamented that the verdict returned by the jury should be suspect in any way.

The trial judge, in charging the jury, said: "Your verdict must be unanimous before you can be discharged." He was wrong. When a man is convicted of crime, he must be assured that twelve jurors freely and of their own will voted to convict him. There can be no such assurance in this case. It could have been that on the final vote 8 stood for conviction and 4 for acquittal, but, since the minority were told they could not go home unless there was unanimity, they could well have abandoned their beliefs and their honest conclusions in order to get home.

The judge's charge deprived the defendant of his constitutional prerogative which says in Article I, Sec. 6: "Trial by jury shall be as heretofore, and the right thereof remain inviolate."

A jury trial in Pennsylvania has always encompassed a voluntary unanimous verdict. If such unanimous voluntariness cannot be attained, a new trial is imperative.

The majority opinion treats the lapse in the judge's charge as a mere bruise in the anatomy of the trial, one that was healed by the rest of what was said by the judge. I regard the lapse as a major irreparable fracture in the trial. Nothing which was said by the judge in the remaining portion of his charge could remedy the harm accomplished when he said in effect that the individual jurors would never see their wives, husbands and children again unless they unanimously agreed on a verdict.

What the judge probably intended to say was: "Your verdict must be unanimous before you can find the defendant guilty or innocent." He did not, however, say this. He used the wrong words and in using the wrong words he gave the jury the wrong tools with which to work. And the jury could have hammered out an improper verdict with the wrong tools.

There are some mistakes in a charge which are of so grave a character that nothing can wash the resulting stain out of the garment of justice. Let us suppose the judge had said: "The defendant is to be presumed guilty until proved innocent." No matter if the rest of his charge would have favored the defendant by a proportion of 90 to 10, the defendant, in the event of a conviction, would have been indubitably entitled to a new trial. The Constitution would have been involved.

One can stumble over a statute, misquote a decision, stutter through a rule of law, garble an accepted jurisprudential principle, and somehow justice may still be done, but one cannot misstate the Constitution and expect all to be well. To misquote or misapply the Constitution is to smash a hole in the dikes of inalienable prerogatives, privileges and rights, with a possible flooding away of guarantees to life, liberty and property.

What the majority has done has been to amend the Constitution, which it has no right to do, and naturally, to that kind of insupportable procedure, I must Dissent.