## Commonwealth v. Butts

Before Sloane, P. J. and Lefever, J.

*Gordon Gelfond,* Assistant District Attorney, for Commonwealth.

*Robert C. Nix, Jr.,* for defendant.

LEFEVER, J., June 29, 1964.—On March 9 and 10, 1964, defendant, George T. Butts, was tried before Judge Lefever, without a jury, on indictments charging: (1) driving a motor vehicle while under the influence of intoxicating liquor and (2) involuntary manslaughter. Defendant was found guilty on both indictments. Defendant has filed motions: (1) for arrest of judgment and (2) for new trial. These motions are based upon alleged insufficiency of the proofs and alleged trial errors.

On November 27, 1961, at about 5:50 p.m., on the extreme east side of 21st Street, just south of Delancey Place, Philadelphia, the front of defendant's maroon and white Dodge automobile, facing south, collided with the rear of a white Ford automobile, and the front of the latter collided with the rear of a white Bel-Air Chevrolet automobile. Immediately after the collision, the unconscious body of Romeo Minora, Jr., a 13-year old boy, was discovered lying on the trunk of the Ford.

Twenty-first Street is a one way street south. It is 26 feet wide, with a 12-foot east sidewalk. Delancey Place is 16 feet wide, with a 10-foot south sidewalk. On the east side of 21st Street, south of Delancey Place, were several parking meters and a City sign reading: "Two-hour meter parking." There were traffic signal lights at 21st and Spruce Streets and at 21st and Pine Streets, the streets immediately north and south of Delancey Place, a mid-block street.

1. *Did the Commonwealth meet the burden of proof that defendant was intoxicated and caused decedent's death?*

There were no eye witnesses to the collision. However, Patricia Dolan, who lived on the third floor apartment of the building at the southeast corner of Delancey Place and 21st Street, testified that at about 5:50 p.m. that evening, "having been aware of a tremendous crash, I went to the window and I remember a body going up into the air and landing on the trunk of a car." Defendant's "black car . . . is the one that hit the Ford in the front." She immediately notified the police by telephone.

Police officers arrived at the scene of the accident a few moments later. The weather was dry and clear. It was "getting dark" and the street lights were lit. Testimony of the officers and the photographs, which were admitted into evidence, indicate that the front of defendant's car was headed diagonally into the rear

of the Ford in a southeasterly direction, with its front end 46 feet south of the south curb of Delancey Place; that its left front wheel was almost against the curb; and that two or three wheels of the Ford were pushed up over the curb onto the east sidewalk, between the parking meter and the sign. Defendant's car was badly smashed in front, particularly on the left front (Commonwealth Exhibits 3, 4, 6 and 9). The right rear of the Ford was damaged (Commonwealth's Exhibits 3, 4 and 6). The rear of the Chevrolet was damaged and it was pushed partly onto the sidewalk (Commonwealth's Exhibit 8). There were no skid marks on the street. The Dodge's engine was still running. The Ford and the Chevrolet were not occupied and their engines were not running. The inference is clear that no brakes were applied before the collision and that the parked Ford and Chevrolet were pushed onto the east sidewalk on 21st Street by the collision.

Officer Placentra testified that he and Officer Lang arrived at the scene of the accident about 5:56 p.m.; that they found all cars at rest; that defendant's engine was running; that the other engines were not running; that defendant was alone slumped in the front seat of his Dodge behind the wheel; that there was a strong odor of alcohol on defendant's breath; that defendant "had a slight cut over his left eye"; and that defendant mumbled indistinctly in answer to questions. Officer Lang testified much the same. In addition, he testified that they received the radio call at 5:55 p.m., when their patrol car was between 20th and 21st Streets on Spruce Street, and they arrived at the scene one minute later.

Officer Evans testified that he and Officer Daw arrived at 6 p.m.; that they observed defendant behind the wheel of his automobile; that an hour and a half later in the hospital there was "a strong odor of alcohol on his breath"; that he was surly and belligerent; that

they had "to take him by the arms and take him out of the hospital," one officer on each arm; that "I'd say he was drunk." Officer Daw corroborated this testimony. He testified that in his opinion defendant was intoxicated.

Officer Brooks testified that defendant was lying on the driver's seat of his car; that he had the odor of alcohol on his breath; that defendant was dazed and stuporous; that he had to help defendant out of his automobile into the police wagon; that one and a half hours later, in the hospital, defendant was belligerent, boisterous, mumbling and was still staggering; that he had difficulty in standing up and difficulty in dressing; he was unable to button his underpants and trousers; and that he still had a heavy odor of alcohol on his breath. He kept repeating "I didn't kill no ———— [1] white boy."

Dr. Gilbert Fineman,[2] police surgeon, testified that he examined defendant at 8:30 p.m., that evening. Defendant had a subnormal temperature of 97 degrees orally; "he had an abnormally high pulse rate of 148 per minute"; his pupils were enlarged and fixed; there was a very strong odor of alcohol about him; his speech was slurred; his clothing was disarrayed; his coordination was poor and his station was swaying; his gait was unsteady and imbalanced; he was sullen. Defendant admitted to Dr. Fineman that "he was intoxicated." Dr. Fineman gave him the finger to nose test, the heel to toe test and the Rhomberg test; all were positive. On the basis of the foregoing Dr. Fineman testified that it was his unequivocal opinion that defendant was then "under the influence of intoxicating beverages and was unable to operate a motor vehicle." Dr. Fineman was cross-examined as to the effect of the

---

[1] A vile vulgarism was used a number of times by defendant, which there is no need to repeat.

[2] Dr. Fineman died suddenly about one week after the trial.

cut above defendant's left eye on his condition. The doctor answered that it had no effect on defendant's condition and that it did not change his opinion that defendant was intoxicated.

The deceased's father arrived at the scene between 5:30 p.m. and 6 o'clock p.m. to meet his son, according to their usual arrangement, as the father was a carrier of newspapers for the Evening Bulletin and his son was his helper. It was customary for the father to meet the boy on the southeast corner of Delancey Place and 21st Street. On arrival the father found the boy lying face up "stretched out like Christ on top of the car dead." The father saw defendant; "He was there in the car and I thought he was sleeping behind the wheel."

The police promptly took the boy to Graduate Hospital. There he was pronounced "dead on arrival."

Officer Hinchcliff of the Accident Investigation Squad arrived at the scene at 6:20 p.m. He found a brown mark on the front of defendant's automobile, which in his opinion came from the newspaper belt of the dead boy when defendant's car struck him, and a black mark which in his opinion came from the boy's heel. [These are respectively marked "1" and "2" on Commonwealth's Exhibit 9.]

Officer Hinchcliff interrogated defendant at Graduate Hospital, shortly after 7:00 p.m. Defendant, on being questioned about the accident, said:

"A I don't know what happened. I must have blacked out or something. I just don't know what happened.

"Q Which way were you traveling?

"A I don't know.

"Q Where were you coming from?

"A I worked today.

"Q Did you have anything to drink today?

"A I had some wine, beer, and whiskey.

"Q Where do you work?

"A I work for the City at Craig and Rhawn. I worked until 4:30 today. I stopped four times to get my drinks."

Dr. James T. Weston, Assistant Medical Examiner of Philadelphia County, performed an autopsy upon decedent. He found a traumatic rupture of the spleen, perforation and hemorrhage of the small intestine, injury to the fifth and sixth cervical vertebrae, a broken neck and severe swelling of the brain. He also noted numerous abrasions, scratches and bruises of the right and left eyelids, left forehead, left cheek, left breast, left hip bone, left elbow, abdomen, back, left knee, right ankle and right leg. In the examiner's opinion the injuries to the spinal cord, neck and brain caused instantaneous unconsciousness and paralysis, followed shortly thereafter by death.

"In a homicide case, the Commonwealth must prove beyond a reasonable doubt that (1) a death has occurred, (2) that the death resulted from criminal agency, and (3) that the defendant is legally responsible for the death. See Commonwealth v. Gardner, 282 Pa. 458, 128 Atl. 87 (1925). The Commonwealth, however, is not restricted to direct proof of these elements but, on the contrary, circumstantial evidence alone may suffice so long as the inferences arising therefrom prove the fact in question beyond a reasonable doubt. Commonwealth v. Sauders, 390 Pa. 379, 134 A. 2d 890 (1957) ; Commonwealth v. Kloiber, 378 Pa. 412, 106 A. 2d 820 (1954)": Commonwealth v. Chester, 410 Pa. 45. "Proof by eye witnesses or direct evidence of the corpus delicti or of identity or of the commission by the defendant of the crime charged is not necessary. '. . . It is clearly settled that a man may be convicted on circumstantial evidence alone . . .' ": Commonwealth v. Bolish, 381 Pa. 500, 508. "The corpus delicti, like other facts, may be shown by circum-

stantial evidence; it is sufficient if these circumstances are consistent with crime even though they are also consistent with suicide or accident; if it were otherwise it would be impossible in many cases, where there were no eye witnesses, to convict a criminal": Commonwealth v. Homeyer, 373 Pa. 150, 156.

Applying the foregoing principles to the instant case, it was proper for the trial judge to give full weight to the circumstantial evidence.

The engine of defendant's automobile was running when the officers arrived. The sign, the parking meter, the testimony of the police officers and decedent's father, the photographs and the position of the respective automobiles after the accident provided strong circumstantial evidence that prior to the accident the Ford and the Chevrolet were parked on the east side of 21st Street, beyond Delancey Place, facing south; that defendant's Dodge ran into the rear of the Ford, pushing it onto the sidewalk, and in turn colliding with the Chevrolet, and partially pushing it onto the sidewalk. Decedent's father specifically testified that the car on which his son was lying "was parked on the east side of 21st Street." The absence of skid marks strongly indicates that defendant's brakes were never applied. The presence of the dead boy on the trunk of the Ford, together with Miss Dolan's testimony, points unerringly to the fact that defendant's automobile struck him either on 21st Street or on the east sidewalk thereof, and threw him into the air, and that he landed on the trunk of the Ford. The autopsy revealed that the boy died as a result of the serious injuries which were consistent with being struck by an automobile. In short, it seems patent that defendant's operation of his automobile was the cause of decedent's death.

The strong odor of alcohol on defendant's breath, which was noticed by all the police officers, and its persistence until 8:30 p.m., when Dr. Fineman examined

defendant, is evidence of the quantity of alcoholic beverages defendant consumed. Defendant's position in his automobile, slumped in the driver's seat or over the wheel, his staggering gait, his inability to button his underpants and trousers or stand straight, his boisterousness, his belligerence, his uncouth language, his mumbling, his need of assistance when he entered and left the various motor vehicles until he reached the police station after 8:00 p.m., are the hallmarks of alcoholic intoxication. This is fortified by the opinion of trained police officers and by Dr. Fineman's tests and opinion. Defendant's admission that he had been drinking heavily and was intoxicated was the final link in the chain of evidence. We are of the opinion that the evidence was clear, beyond reasonable doubt, that defendant was under the influence of intoxicating beverages when his automobile struck decedent.

Section 1037 of The Vehicle Code of April 29, 1959, P. L. 58, of Pennsylvania, 75 PS §1037, provides:

"It shall be unlawful for any person to operate a motor vehicle . . . while under the influence of intoxicating liquor . . . or permit any person who may be under the influence of intoxicating liquor . . . to operate any motor vehicle . . . owned by him or in his custody or control."

Defendant clearly violated this statute. Therefore, the trial judge properly found him guilty of involuntary manslaughter on this indictment.

The Penal Code of June 24, 1939, P. L. 872, 18 PS §4703, provides:

"Whoever is convicted of involuntary manslaughter, happening in consequence of an unlawful act, or the doing of a lawful act in an unlawful way, is guilty of a misdemeanor . . ."

Driving while intoxicated is an unlawful act for the purposes of this statute: Commonwealth v. Tole, 25 Dist. R. 957; Commonwealth v. Kulgaucuk, 27 Erie

78; see Commonwealth v. Piper, 183 Pa. Superior Ct. 229. As stated in Commonwealth v. Gill, 120 Pa. Superior Ct. 22, 35:

"If the act is unlawful,—that is, is forbidden by law, illegal, contrary to law,—and the death of another results as a consequence of it, it constitutes involuntary manslaughter.

"Death resulting from some motor vehicle accidents may constitute involuntary manslaughter, not because death was caused by negligence, with an element of rash and reckless conduct present, but because it resulted from a violation of a statute which made the act causing death unlawful."

It follows from the above that it was not necessary for the Commonwealth to prove that defendant was negligent or rash or reckless in the operation of his motor vehicle. It was sufficient for the Commonwealth to show that (1) defendant was intoxicated; (2) he operated a motor vehicle; and (3) the vehicle caused decedent's death.

State v. Ponce, 59 Ariz. 158, 124 P. 2d 543, was a case very similar to the instant one. The court stated, 124 P. 2d, at page 543, et seq.:

" 'If, therefore, defendant was driving an automobile upon the highways, while under the influence of intoxicating liquor, and while so doing ran into Remington in such a manner that the blow inflicted by the automobile was the proximate cause of the injury which caused Remington's death, he would be guilty of involuntary manslaughter.'

. . .

"Under the question as certified the cause of death was a collision in which an automobile operated by one under the influence of intoxicating liquor was a proximate cause. It is here that we think defendant has unconsciously fallen into error. He apparently believes the state contends the intoxication was the un-

lawful act which was the proximate cause of the death. But this is not true. It is the operation of the motor vehicle which is forbidden. Had defendant remained quietly seated in the vehicle, without attempting to operate it, no matter how intoxicated he was, even though there was a collision between the automobile and the deceased, which caused the death of the latter, defendant would not have been guilty of any unlawful act. But, instead of refraining from operating the vehicle, he was the active motivating cause of its operation while he was intoxicated, and the operation he was engaged in, and not his intoxication, was what caused the death. The operator was unquestionably committing an unlawful act, not amounting to a felony, by operating the vehicle, and this act, and not the intoxication, was a proximate cause of the death, and unless the evidence introduced by the state raised a presumption that the collision was the fault of the deceased, we think a verdict of manslaughter would be sustained."

It is to be noted that defendant's driver's license carried a restriction prohibiting him from driving without spectacles. There is an abundance of proof that defendant was not wearing his spectacles after the accident. In fact, they were discovered in the glove compartment of his automobile. The trial judge gave little weight to this. However, it is apparent that defendant was guilty of this second unlawful act, viz., not wearing his glasses, as required, when he drove his automobile on this fatal day. This serves only to fortify the conclusion above reached.

In the instant case the Commonwealth proved beyond reasonable doubt the existence of the three factors stated above. Counsel for defendant urges that the accident could have occurred in some theoretical way other than that shown by the Commonwealth. But it was defendant's duty to prove this. No such

proof was presented. The Commonwealth is not required to prove its case beyond *any* doubt, no matter how conjectural or illusory. The Commonwealth proved its case beyond a reasonable doubt.

2. *The Testimony of Dr. Fineman and a Copy of the Medical Report Prepared by Him Were Admissible.*

Dr. Gilbert Fineman, Police Surgeon, testified that he had no independent recollection of the facts which appeared in his report, written in his own hand. However, he unequivocally testified that he made the examination of defendant; that he employed the procedures in this case which he followed in all cases of alleged drunken driving; that the report was handwritten by him at the time of the examination or "within minutes after the examination was completed" when the facts were fresh in his mind. Over defense objection the report was admitted as an unnumbered Commonwealth's exhibit and Dr. Fineman was permitted to testify from that report.

The report was properly admitted, as past recollection recorded: Christian Moerlein Brewing Co. v. Rusch, 272 Pa. 181, 186: There the court stated at page 187:

"J. Greenfelder, as plaintiff's agent, had numerous conversations with defendant concerning questions pertinent to this suit. While the matter was fresh in his mind, Greenfelder put the conversations in writing in the form of reports to plaintiff. At the trial, Greenfelder was examined as a witness, but could not recall the substance of the conversations, even with the aid of the reports. He, however, identified the reports and testified, in a general way, as to his knowledge of their accuracy when made. The admission of the reports, over defendant's objection, constitutes the fifth assignment of error. The question was rightly ruled. Where a witness had a present recollection of a past event, although his memory is refreshed by a memorandum

made at the time of the event, he testifies from such recollection; *but where he has no present recollection of such past event, even when aided by his memorandum, the latter itself may be offered in evidence, on proof by the witness of his knowledge of its accuracy when made and that it was made when the transaction was fresh in his mind.* This is in terms past the recollection of the witness and is admissible in evidence under the great weight of authority." (Italics supplied.)

The above was quoted with approval in Miller v. Exeter Borough, 366 Pa. 336, 342; and Henry Pa. Evid., 4th Ed. §823. See Commonwealth v. Levi, 44 Pa. Superior Ct. 253.

The entire subject of refreshing recollection from memoranda and past recollection recorded is exhaustively covered in Kinsey v. State, 49 Ariz. 201, 65 P. 2d 1141, 125 A. L. R. 3, and in the succeeding compendious annotation in 125 A. L. R. 19, et seq. That annotation states at page 81: "And it is now almost universally held both in England and the United States that upon the laying of a proper foundation, a witness may testify from a written memorandum though it does not recall the facts to his memory." And at page 165, it is stated: "Since a record of past recollection used by witness after verification becomes his 'present evidentiary statement' it is ordinarily held that even though it would not be evidence per se of its contents, it may be admitted in evidence in connection with his testimony, as part of his direct examination."

Defendant relies on Commonwealth v. Renshaw, 75 Montg. 224. This case is not apposite, inasmuch as the district attorney agreed that a new trial should be granted in that case. In any event, we do not agree with the decision in that case for the reasons stated by the trial judge.

Defendant also urges that Dr. Fineman's testimony

from his written report and the admission of that report into evidence deprived defendant of his right of cross-examination. This argument was cogently refuted in Kinsey v. State, supra, 49 Ariz. 201, 220, 65 P. 2d 1141, 1149, 1150:

"The objection in regard to cross-examination, on its face, might seem to have some weight, but we think a careful analysis of the question will show that it also is unfounded. What is the purpose of cross-examination? Obviously it is to convince the triers of fact, in some manner, that the testimony of the witness is untrue, there will be no need nor desire for cross-examination. How, then, may the truthfulness of the evidence of a witness be attacked through cross-examination? It seems to us that all attacks thereon must be reduced to one of three classes: (a) upon the honesty and integrity of the witness; (b) upon his ability to observe accurately at the time the incident occurred; and (c) upon his accuracy of recollection of the past events. When a witness testifies as to his present recollection, independent or revived, he may, of course, be cross-examined fully on all three of these points. When he testifies as to his past recollection recorded, he can be examined to the same extent and in the same manner as to the first and second of these matters. He cannot well be cross-examined on the third point, but this is unnecessary, for he has already stated that he has *no* independent recollection of the event, which is all that could be brought out by the most rigid cross-examination on this point when the witness testifies from his present recollection, independent or revived."

We conclude that the testimony of Dr. Fineman and his report were properly admitted.

3. *It was not reversible error to permit the introduction of the deceased's safety patrol membership card.*

When this card was offered in evidence counsel for defendant objected, stating: "I would again, in light of the answer, renew my objection and move to strike. Certainly whether a person is or is not on a safety patrol does not necessarily indicate whether on a given day under given circumstances he was or was not negligent."

The court admitted the card in evidence and stated that even though the victim's negligence was not relevant, the card was admissible to establish the mens rea. No objection was made to the admissibility of the card on this latter ground. It has long been the rule that if the ground upon which an objection to testimony is based is specifically stated, all other reasons for exclusion are waived: Commonwealth v. Raymond, 412 Pa. 194.

Assuming arguendo, that the card was improperly admitted, the card did not constitute a material part of the Commonwealth's case and had no effect on the verdict. Contributory negligence of the victim, per se, is not a defense to involuntary manslaughter: Commonwealth v. Root, 191 Pa. Superior Ct. 238, 245 [reversed on other grounds: 403 Pa. 571].

4. *It was not reversible error to permit the cross-examination of Charles Haney.*

The credibility of every witness is always in issue. Credibility may be attacked by cross-examination. What could go more directly to the credibility of a witness who testified that defendant had an unimpeachable reputation for *sobriety* and peacefulness than the fact that this witness, and his friend, Corrie Warren, and defendant embarked on the drinking spree, which preceded and apparently led to this tragic accident now before the court. Certainly two people, i.e., the witness and the friend knew that defendant did not, or should not, have such reputation. Cf. Commonwealth v. Jenkins, 413 Pa. 606, 607, where it is stated:

"Character witnesses may legitimately be questioned as to whether or not they ever heard *persons in the neighborhood* attribute particular offenses to the defendant. This is allowable for the purpose of testing the accuracy of the witness's testimony by showing that he or she is not thoroughly familiar with the reputation concerning which he has testified. However, prejudicial questions, which obviously are for the purpose of showing *the commission of a specific crime or crimes for which the defendant is not presently accused,* are not legitimate or fair on cross-examination." (Italics supplied.)

In the instant case the challenged cross-examination dealt not with other crimes but with the specific conduct of defendant on the day in question and was directed to defendant's reputation for sobriety in the judgment of the witness and friend, Warren. It would seem that this was a proper attack on the credibility of the witness.

Assuming arguendo, however, that this cross-examination of Haney were improper, a new trial should not be granted *unless some substantial wrong or miscarriage has been occasioned thereby:* Commonwealth v. Curcio, 218 Pa. 327; Commonwealth v. Clamar, 16 Dist. R. 69; and United States v. Boston, 330 F. 2d 937.

In Commonwealth v. Clamar, supra, Chief Justice, then Judge, Von Moschzisker stated at pages 70 and 71:

". . . the general rule is that a new trial will not be granted on the ground of the improper admission or rejection of evidence, unless, in the opinion of the court, some substantial wrong or miscarriage has been thereby occasioned, and the modern tendency is against the granting of new trials in criminal actions where the court is fully satisfied of the guilt of the defendant, unless likewise satisfied that substantial and plainly harmful error has been committed: Com. v.

Lenousky, 203 Pa. 277 . . . we do not see that this testimony can be said to have done the case of the woman defendant any material harm, or to have done the case of her co-defendant any harm at all, and as we are fully convinced that, entirely excluding this incompetent testimony, the other evidence in the case fully justified the verdict of guilty as to both of the defendants, and therefore that no miscarriage of justice was caused by the admission of this bit of incompetent testimony, we are satisfied that its admission under the facts here presented can be properly classed as harmless rather than as substantial or reversible error."

In United States v. Boston, supra, the Court, speaking per Circuit Judge Moore, stated at page 940:

"Finally, appellant challenges the use of police or 'rogues gallery' photographs of the other co-conspirators in the case who had previously pleaded guilty to the conspiracy count and who had been convicted prior to appellant's trial. The photographs were validly used in the prosecution of the conspiracy charge to enable various witnesses to establish the identity of the co-conspirators, as bearing upon their relationship to, and association with, appellant. See 3 Wigmore, Evidence, §§ 792-3 (3d ed. 1940). *There being no jury, the presence of the police numbers on the photographs was not prejudicial especially in the light of the assurances by the trial judge against such harm.*" (Italics supplied.)

Haney's testimony had no effect upon the finding of defendant's guilt. There was more than ample factual evidence upon which to base the finding that defendant was intoxicated, plus the corroborating opinions of the trained police officers and Dr. Fineman, and defendant's own admission. Nothing was said about Haney by the trial judge in his oral findings of fact which appear on pages 198, et seq., of the notes of testimony.

We conclude that no substantial error has been shown and that the trial judge properly found defendant guilty of both charges.

Accordingly, June 29, 1964, the motions for arrest of judgment and for new trial are denied.